## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DELTA AIR LINES, INC.,<br>1030 Delta Boulevard<br>Atlanta, GA 30320-6001;<br><br>HAWAIIAN AIRLINES, INC.,<br>3375 Koapaka Street, #G-350<br>Honolulu, HI 96819; and<br><br>AIR LINE PILOTS ASSOCIATION, INT'L,<br>1625 Massachusetts Avenue, N.W., 8th Floor<br>Washington, D.C. 20036,<br><br>    Plaintiffs,<br><br>    v.<br><br>EXPORT-IMPORT BANK OF THE<br>UNITED STATES; FRED P. HOCHBERG,<br>in his Official Capacity as Chairman and<br>President of the Export-Import Bank of the<br>United States; WANDA FELTON, in her<br>Official Capacity as First Vice President and<br>Vice Chair of the Export-Import Bank of the<br>United States; and SEAN MULVANEY and<br>PATRICIA M. LOUI, in their Official<br>Capacities as Members of the Board of<br>Directors of the Export-Import Bank of the<br>United States,<br>  811 Vermont Avenue, N.W.<br>  Washington, D.C. 20571,<br><br>    Defendants. | Civil Action No. 14-42 |

## COMPLAINT

Plaintiffs Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), and the

Air Line Pilots Association, International ("ALPA") (collectively, "Plaintiffs") allege as follows:

## NATURE OF THE CASE

1.      Defendant Export-Import Bank of the United States ("Bank") is a federal agency and a wholly owned U.S. government corporation that provides loans, loan guarantees, and insurance commitments to foreign corporations.  The Bank was created and is governed by the Export-Import Bank Act of 1945 ("Bank Act"), as amended, 12 U.S.C. § 635 *et seq.*

2.      The Bank's obligations carry the full faith and credit of the U.S. government, which allows recipients of a loan, loan guarantee, or insurance commitment from the Bank to finance their purchases of American exports more cheaply than they could through private lenders.  But this also means that if a recipient fails to pay its debt, the U.S. Treasury, and hence American taxpayers, picks up the bill.

3.      The Bank's loans, loan guarantees, and insurance commitments are meant to be used for the overall net benefit of U.S. industry and employment by promoting exports.  When the Bank subsidizes exports, however, its actions can and do have negative effects on other U.S. companies and their employees by subsidizing their foreign competitors.  To prevent the Bank from doing more harm than good, Congress has directed the Bank to consider the adverse economic impact of its actions whenever it issues financing commitments.

4.       One type of export that the Bank subsidizes frequently and heavily is the export of aircraft by U.S. manufacturers and in particular by The Boeing Company ("Boeing").  In FY2012, the Bank's total exposure to outstanding financial commitments was $106.6 billion.  Approximately 46% of this amount was for air transportation loans and loan guarantees—more than the three next-largest industrial sectors combined.

5.      The Bank's aggressive approach to aircraft financing allows foreign airlines to borrow at much cheaper rates than they could in the private market.  Cheaper financing, in turn,

leads to competitive advantages for foreign airlines vis-à-vis their American competitors, shifts industry growth abroad, and puts downward pressure on American production and employment. U.S. airlines and their employees, including Plaintiffs in this action, have urged the Bank to reconsider its subsidies to foreign airlines because of these adverse economic effects.

6.     Until April 2013, the Bank applied to all transactions a "set of Economic Impact Procedures" that "screen[ed] out transactions that do not 'result in the foreign production of an exportable good.'" *Delta Air Lines, Inc. v. Export-Import Bank of the United States*, 718 F.3d 974, 976 (D.C. Cir. 2013) ("*Delta I*") (per curiam).  As a result of applying that screen, the Bank did not "specifically consider the impact of . . . loan guarantees" provided to foreign airlines "on U.S. industries and U.S. jobs."  *Id.*

7.     On September 30, 2011, while the screen was in place, the Bank announced that it had approved $1.3 billion in loan guarantees and $2.1 billion in preliminary commitments to support the commercial sale of 30 Boeing aircraft to Air India (the "Air India Commitments").

8.     In November 2011, the Air Transport Association of America (later joined by current Plaintiffs Delta and ALPA) brought suit challenging the Air India Commitments. Although the Bank initially persuaded a district court that its actions were lawful, *see Air Transp. Ass'n of Am. v. Export-Import Bank of the United States*, 878 F. Supp. 2d 42 (D.D.C. 2012) ("*ATA*"), the D.C. Circuit held that the Bank, "at a minimum, ha[d] not reasonably explained its justification for the categorical conclusion at issue [in the Air India transaction]," *Delta I*, 718 F.3d at 978.  The court of appeals therefore remanded the transactions to the Bank for further explanation.

9.     On November 22, 2013, the Bank posted on its website two "Responses" to the D.C. Circuit's remand order.

10.     According to the Bank's counsel, the two Responses constitute the Bank's "official response" to the D.C. Circuit's remand and were "reviewed and commented on by the Bank's senior staff and all members of the Bank's Board of Directors," though "[t]he responses were not the subject of a meeting of the Board of Directors."  The Bank did not provide notice of or an opportunity for comment on the Responses.

11.     This action is a challenge to the Bank's Responses and the underlying Air India Commitments that the Responses attempt to rationalize.  As set forth in this Complaint, the Air India Commitments continue to violate the Bank Act (as amended) and the Administrative Procedure Act ("APA").  This Court should therefore hold the Air India Commitments unlawful and set them aside.

## JURISDICTION AND VENUE

12.     The Court has statutory subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

13.     This Court has Article III jurisdiction over this action because Plaintiffs have been injured in fact; because their injuries are fairly traceable to the Bank's unlawful action in issuing the Air India Commitments; and because an order of this Court vacating the Air India Commitments would redress Plaintiffs' injuries.  Specific factual allegations supporting this Court's jurisdiction under Article III are set forth at paragraphs 36 to 75.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this is an action against an agency of the United States, and at least one plaintiff and at least one defendant reside in this district.

## PARTIES

15.     Plaintiff Delta is an airline that provides scheduled air transportation for passengers and cargo throughout the United States and around the world.  Delta's global route network gives it a presence in every major domestic and international market.  Delta's route network is centered around the hub system that it operates in several major cities, including Amsterdam, Atlanta, New York, Paris, and Tokyo.  Each of these hub operations includes flights that gather and distribute traffic from markets in the geographic region surrounding the hub to domestic and international cities and to other hubs.

16.     Delta is a Delaware corporation that has its headquarters in Atlanta, Georgia.

17.     Plaintiff Hawaiian is an airline based in Honolulu, Hawaii, that provides scheduled air transportation for passengers and cargo.  Hawaiian has been in continuous operation for 84 years and is the largest provider of passenger air service and from to Hawaii's primary visitor markets on the U.S. mainland.  Hawaiian offers more nonstop service between Hawaii and U.S. gateway cities (11) than any other airline, along with service to and from Japan, South Korea, the Philippines, Australia, American Samoa, and Tahiti.  Hawaiian also provides approximately 170 daily jet flights between the Hawaiian Islands.

18.     Hawaiian is a Delaware corporation with its headquarters in Honolulu, Hawaii.

19.     Plaintiff ALPA is an unincorporated labor organization representing approximately 47,000 pilots employed by 28 U.S. commercial airlines.  Among the pilots represented by ALPA are those who work for airlines that provide significant international services (including Alaska, United, Delta, FedEx, and Hawaiian).  ALPA has an international headquarters office in Washington, D.C.

20.     Defendant Export-Import Bank of the United States is the official export credit agency of the United States.  The Bank is headquartered in Washington, D.C.  The Bank offers working capital guarantees, export credit insurance, direct loans, and loan guarantees to benefit U.S. exporters.

21.     Defendant Fred P. Hochberg is the Bank's President and Chairman.  He has overall responsibility for assuring the Bank's compliance with the law and is responsible for voting to approve its financing commitments.  He is sued in his official capacity only.

22.     Defendant Wanda Felton is the Bank's First Vice President and Vice Chair.  She is responsible for voting to approve the Bank's financing commitments.  She is sued in her official capacity only.

23.     Defendants Sean Mulvaney and Patricia M. Loui are members of the Bank's Board of Directors.  They are responsible for voting to approve the Bank's financing commitments.  They are sued in their official capacities only.

## STATUTORY FRAMEWORK

24.     President Franklin D. Roosevelt established the original Export-Import Bank of Washington during the Great Depression in order to "reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry" by increasing U.S. exports.  Exec. Order No. 6581, 12 C.F.R. § 401 (Feb. 2, 1934), *reprinted as amended in* 12 U.S.C. § 635.  Congress turned the corporation into an "agency of the United States" and codified its powers in the Bank Act, under which the Bank's "objective" in making loans, loan guarantees, and other commitments continues to be "maintaining or increasing employment of United States workers."  12 U.S.C. § 635(a)(1).  The Bank Act further expresses "the policy of the United States that the Bank in the exercise of its functions should supplement and encourage, and not compete with,

private capital," and "that loans, so far as possible consistent with . . . carrying out . . . the [Bank's] purposes . . . , offer reasonable assurance of repayment." *Id.* § 635(b)(1)(B).

25.     The Bank Act authorizes the Bank to extend various types of commitments to foreign buyers, including direct loans and loan guarantees, but expressly requires that such commitments comply with several procedural requirements and substantive prohibitions. *Id.* § 635(b)(1)(A).

26.     In particular, the Bank Act requires the Bank to consider, among other things, the adverse effect its commitments will have on U.S. industries and employment. *Id.* §§ 635(b)(1)(B), 635a-2.

27.     Subsection 635(e) of the Bank Act provides several limitations on the Bank's provision of loans or loan guarantees that "adversely affect[] the United States." One of those limitations is found in § 635(e)(1), which prohibits the Bank from approving loans or loan guarantees that cause "substantial injury" to U.S. companies. Another limitation is found in § 635(e)(7), which imposes certain notice-and-comment obligations "to reduce adverse effects of loans and guarantees on industries and employment in [the] United States."

28.     These safeguards are necessary because Bank-backed loans offer foreign airlines extremely favorable terms—backed by the full faith and credit of the U.S. government—which offer a significant advantage to foreign recipients of the loans that compete against U.S. companies and workers.

29.     Under the Bank's Loan Guarantee Program, a lender receives a guarantee from the U.S. government that the principal and interest on a loan will be paid in the event of a default by the borrower. "Ex-Im Bank's comprehensive guarantee covers all of the commercial and political risks for 85 percent of the U.S. contract value." Export-Import Bank of the United

States, 2012 Annual Report at 68, *available at* http://www.exim.gov/about/library/reports/

annualreports/2012/files/exim_2012annualreport.pdf (last visited Jan. 8, 2014).

30.     The Bank Act requires the Bank to maintain a Board of Directors (the "Board").

*See* 12 U.S.C. § 635a(c).  Pursuant to the Bank Act, the Board has adopted bylaws that require

the Bank to, among other things, hold regularly scheduled meetings for transacting business.  *See*

Bylaws of the Export-Import Bank of the United States art. I, § 2 (effective as of Aug. 20, 1998),

*available at* http://www.exim.gov/about/whoweare/charterbylaws/bylaws.cfm (last visited Jan. 8,

2014).  A majority vote of the Board members attending those meetings (of which three are

needed for a quorum) constitutes an action of the Board.  *Id.* art. I, § 5.

31.     In 2012, Congress passed the Export-Import Bank Reauthorization Act of 2012

("Reauthorization Act"), Pub. L. No. 112-122, 126 Stat. 350

32.     The Reauthorization Act imposes a number of additional transparency and

accountability requirements on the Bank.  Specifically, Congress required the Bank to provide

advance notice of all applications for financing above $100 million and an opportunity for the

public to comment.  Reauthorization Act § 9(a), 126 Stat. 354-55 (codified at 12 U.S.C.

§ 635a(c)(10)(C)(i)).  The notice must provide "a brief non-proprietary description of the

purposes of the transaction and the anticipated use of any item being exported, including, to the

extent the Bank is reasonably aware, whether the item may be used to produce exports or provide

services in competition with the exportation of goods or the provision of services by a United

States industry."  12 U.S.C. § 635a(c)(10)(C)(ii).

33.     The Reauthorization Act also requires the Bank to provide any comments to the

Bank's Board before the Board takes final action, *id.* § 635a(c)(10)(E), and to provide to

requesting commenters a "non-confidential summary of the facts found and conclusions reached in any detailed analysis or similar study" conducted for the application, *id.* § 635a(c)(10)(F).

34.     Under section 9(b) of the Reauthorization Act, the notice-and-comment provisions described above went into effect on July 29, 2012, Reauthorization Act § 9(b), 126 Stat. 356, before the Bank posted the Responses in November 2013.

35.     The APA provides a right of action against government agencies such as the Bank where their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. §§ 702, 706(2)(A), (C), (D).

## FACTS AND PROCEDURAL HISTORY

### A.     The Bank's Support for Foreign Airlines Generally

36.     The Bank has devoted a substantial portion of its financial commitments to aircraft financing.  From FY2001 to FY2012, the Bank approved more than $67 billion in loan guarantees to foreign airlines and international aircraft lessors.  Those loan guarantees allowed foreign airlines to acquire more than 950 commercial aircraft at below-market rates.

37.     The ability to buy Boeing aircraft using loan guarantees that are backed by the U.S. Treasury gives a significant competitive advantage to the favored foreign airlines.  These airlines are able to raise capital more cheaply and on more favorable terms than they otherwise could.  In some cases, foreign airlines like Air India are able, with the Bank's support, to buy aircraft that they could not otherwise have financed at all on economically feasible terms.

38.     The newly purchased aircraft that foreign airlines purchase with the Bank's assistance also give the foreign airlines competitive advantages by reducing their fuel and

maintenance costs; attracting customers who wish to fly on newer, more desirable planes; and enabling the airlines to charge prices for seats on the *newer* aircraft that are lower than the prices that U.S. airlines must charge for seats on competitive routes on the *older* aircraft that make up their fleets.

39.     Delta, Hawaiian, and the other U.S. airlines that employ pilots represented by ALPA compete directly with the favored foreign airlines that enjoy these benefits.  Delta, Hawaiian, and the other U.S. airlines suffer economic harm as a result of the subsidized competition they face.

40.     In order to compete with the favored foreign airlines, U.S. airlines must take steps such as reducing or altogether eliminating their capacity to serve certain routes.  U.S. airlines may also forgo serving routes they would otherwise serve.  These steps harm the U.S. employees whom ALPA represents because they lead to lost and displaced jobs and fewer hours available to work.

41.     The harm that extending financial assistance to foreign airlines causes to U.S. airlines and their employees is the reason that the Bank Act requires the Bank to consider, among other things, the adverse effect its commitments will have on U.S. industries and employment. 12 U.S.C. §§ 635(b)(1)(B), (e), 635a-2.

**B.      The Bank Makes $3.4 Billion in Financing Commitments to Air India**

42.     On September 30, 2011, the last day of FY2011, the Bank announced that it had approved $1.3 billion in loan guarantees and $2.1 billion in preliminary commitments to support the commercial sale of 30 Boeing aircraft to Air India.  The Bank provided no other information regarding these massive loan guarantees or the review undertaken before they were approved.

43.     The Bank did not solicit public comment prior to approving the Air India Commitments.

44.     At the time the Air India Commitments were approved in September 2011, the Bank's purported means for complying with its statutory obligation to consider the adverse economic impacts of its loan commitments was its 2007 "Economic Impact Procedures" ("2007 EIPs").  *See* Export-Import Bank of the United States, Economic Impact Procedures (Apr. 2007). The 2007 EIPs are attached hereto as Exhibit 1 and incorporated by reference herein.

45.     Under the 2007 EIPs, all applications were subject to a series of "screens" to determine "potential economic impact."   In the first stage, the Bank determined "if the exports involved in a transaction will result in the production of an exportable good."  If they will not, the Bank did not conduct any further economic impact analysis.  In the words of the 2007 EIPs, "only exports of capital goods and services (e.g., manufacturing equipment, licensing agreements) that will result in the foreign production of an exportable good are subject to further economic impact analysis in Stage II of these procedures" (the "exportable-goods screen").

46.     The Bank did not consider applications filed by foreign airlines to warrant an economic impact analysis because the Bank did not consider them to involve exports that "will result in the production of an exportable good."

47.     Because the Air India Commitments were made while the 2007 EIPs were in effect and did not, in the Bank's determination, involve "the production of an exportable good," the Bank applied the exportable-goods screen to exclude the Air India Commitments from meaningful economic impact analysis.

48.     On November 1, 2011, the Air Transport Association of America ("ATA"),[1] an airline trade association that includes Delta among its members, submitted a letter to the Chairman and President of the Bank, Defendant Fred P. Hochberg, explaining in detail the harms caused by the Bank's aircraft-financing practices in general and the Air India Commitments in particular ("November 1 Letter").  ATA's November 1 Letter and its exhibits are attached hereto as Exhibit 2 and incorporated by reference herein.

49.     ATA's November 1 Letter provided (among much other information) specific examples of situations in which Delta had lost revenue, and ALPA's members had lost jobs, as a result of competition from Air India after the Bank had issued previous subsidized financing commitments to Air India.  For example, Delta cut its New York-to-Mumbai route in October 2008 after Air India—which used the $3.3 billion in loan guarantees it received from the Bank between 2006 and 2009 to purchase numerous widebody aircraft—flooded the U.S.-India market with extra capacity and crowded out competitors.  *See* Ex. 2 at 5.

50.     On November 1, 2011, Plaintiff ALPA also sent a letter to the Bank.  ALPA voiced its support of ATA's letter and, in its own letter, described the adverse impact of the Bank's financing on jobs at U.S. airlines.  ALPA's letter is attached hereto as Exhibit 3 and incorporated by reference herein.

51.     The Bank responded to ATA's November 1 Letter on November 10, 2011 ("November 10 Letter").  In its letter, the Bank confirmed that the Air India final and preliminary commitments "ha[d] been considered by the Board of Directors and, with regard to the final commitments, were fully and finally approved on September 30, 2011," and the Bank did not

---

[1] ATA is not a party to the instant suit.  Since the *Delta I* litigation, ATA has become Airlines for America.  To avoid confusion, we simply refer to both organizations as ATA.

agree to reconsider those commitments. The Bank's November 10 Letter (which is misdated November 8, 2011) is attached hereto as Exhibit 4 and incorporated by reference herein.

52. Until the litigation described below, the Bank did not release any further information about the Air India Commitments or its review process.

**C.** **The *Delta I* Litigation**

53. On November 16, 2011, ATA, on behalf of its member airlines, brought suit against the Bank seeking a declaration that the Bank and its Board had violated the Bank Act and the APA by using the 2007 EIPs' exportable-goods screen to avoid conducting an economic impact analysis of the Air India Commitments. *See Air Transp. Ass'n of Am. v. Export-Import Bank of the United States*, No. 1:11-cv-02024-JEB (D.D.C. filed Nov. 16, 2011). Plaintiff ALPA later intervened in the case by filing a separate complaint. Plaintiff Delta joined the suit with the filing of the first amended complaint. (We refer to ATA, Delta, and ALPA collectively as the "*Delta I* plaintiffs.")

54. The *Delta I* plaintiffs also alleged that the Bank's guarantees to foreign airlines caused harm to U.S. airlines and their employees by reducing the financing costs of these foreign carriers and increasing their competitiveness. First Am. Compl. ¶¶ 52-101, *Air Transp. Ass'n of Am. v. Export-Import Bank of the United States*, No. 1:11-cv-02024-JEB (D.D.C. filed Feb. 17, 2012) (ECF # 35) ("ATA & Delta Am. Compl."); ALPA Compl. ¶¶ 50-97, *Air Transp. Ass'n of Am. v. Export-Import Bank of the United States*, No. 1:11-cv-02024-JEB (D.D.C. filed Nov. 29, 2011) (ECF # 24) ("ALPA Compl.").

55. With respect to the Air India Commitments, the complaints alleged that the Bank and its Board violated 12 U.S.C. §§ 635(b)(1)(B) and 635a-2 by "approving the Air India Commitments without considering the extent to which they are likely to have an adverse effect

on the domestic airline industry" and on "domestic employment."  ATA & Delta Am. Compl.

¶¶ 103, 106; ALPA Compl. ¶¶ 99, 102.

56.     The complaints further alleged that these violations formed part of the Bank's

policies regarding applications for loan guarantees by foreign airlines in general.  ATA & Delta

Am. Compl. ¶¶ 115, 118, 121, 124; ALPA Compl. ¶¶ 111, 114, 117, 120.

57.     On summary judgment, the district court determined that ATA had standing to

bring its suit because "prior Bank guarantees [had] caused [its members] significant, concrete

injuries and . . . the 2011 [Air India] Commitments are substantially certain to cause them further

injury."  *ATA*, 878 F. Supp. 2d at 63.  The district court also rejected the Bank's argument that its

decisions to issue loan guarantees were not subject to judicial review.  *Id.* at 67.  The district

court, however, granted summary judgment to the Bank, reasoning that the categorical

exportable-goods screen was consistent with the Bank Act.  *Id.* at 81.

58.     Delta and ALPA (but not ATA) appealed to the D.C. Circuit, arguing that the

Bank's exportable-goods screen was inconsistent with the Bank Act and the APA.  In defending

the district court's judgment, the Bank again argued that its loan guarantees were not statutorily

subject to judicial review and that its actions were consistent with the Bank Act and the APA.

The Bank did not, however, renew its argument that the *Delta I* plaintiffs lacked standing.

59.     The D.C. Circuit reversed the district court's ruling.  The court of appeals held

that the Bank's decision to issue a loan guarantee is subject to judicial review under the APA.

*Delta I*, 718 F.3d at 977.

60.     The D.C. Circuit further "agree[d] with Delta that the Bank, at a minimum, ha[d]

not reasonably explained its justification of the categorical conclusion at issue here [i.e., the

exportable-goods screen]."  *Id.* at 978.  "In particular," the court held, "the Bank has not

reasonably explained its apparent conclusion that loans and loan guarantees to help a foreign

company provide a service (as opposed to a good) can *never* cause adverse effects to U.S.

industries and U.S. jobs." *Id.*

61.     The D.C. Circuit ordered the district court to remand the case to the Bank, without

vacating any of the Bank's actions in the matter to date.   *Id.*   The court of appeals stated that, on

remand,

> the Bank should (i) attempt to provide a reasonable explanation for how the
> [2007] Economic Impact Procedures, which screen out loans and loan guarantees
> to service providers, square with the [Bank Act's] requirements, or (ii) adequately
> consider and explain any adverse effects that these particular Air India loan
> guarantees have on U.S. industries and U.S. jobs, or (iii) take whatever other
> action the Bank deems appropriate to comply with the Bank Act and the APA.

 *Id.*

62.     On August 19, 2013, the case was remanded to the Bank for further proceedings.

**D.     The Bank's New Economic Impact Procedures**

63.     While the *Delta I* litigation was pending, Congress enacted the

Reauthorization Act.

64.     Among other things, the Reauthorization Act required the Bank, not later than 180

days after the date of its enactment, to "develop and make publicly available methodological

guidelines to be used by the Bank in conducting economic impact analyses or similar studies

under section 2(e) of the Export-Import Bank Act of 1945."  Reauthorization Act § 12(a), 126

Stat. 357.

65.     Pursuant to the Reauthorization Act, on November 19, 2012, the Bank approved a

set of Economic Impact Procedures and Methodological Guidelines that took effect in April

2013 ("2013 EIPs").  These new 2013 EIPs, which the Bank has made available at

http://www.exim.gov/generalbankpolicies/economicimpact/upload/Final-April-2013-

Procedures.pdf, outline in an appendix a special process that the Bank purportedly uses to consider the adverse economic impact caused by its subsidies to foreign airlines.

66.     The 2013 EIPs replaced the 2007 EIPs' exportable-goods screen with a series of new screens, which, by the Bank's own estimate, will exclude 85%-90% of airline transactions from substantive economic impact analysis.

67.     The 2013 EIPs are the subject of a separate challenge that remains pending in this Court.  *See Delta Air Lines, Inc. v. Export-Import Bank of the United States*, No. 1:13-cv-00192-RC (D.D.C. filed Feb. 13, 2013).

68.     As explained above, the Reauthorization Act also imposed new notice-and-comment requirements on the Bank.  The notice-and-comment requirements took effect on July 29, 2012.

**E.     The Bank's Responses to the D.C. Circuit's Remand Order**

69.     On November 22, 2013, the Bank posted on its website two "Responses" to the D.C. Circuit's remand order.

70.     "Response One" is attached hereto as Exhibit 5 and incorporated by reference herein.  Response One is the Bank's attempt to respond to the D.C. Circuit's order that the Bank "provide a reasonable explanation for how the [2007] Economic Impact Procedures, which screen out loans and loan guarantees to service providers, square with the statute's requirements."  Ex. 5 at 1.

71.     "Response Two" is attached hereto as Exhibit 6 and incorporated by reference herein.  Response Two is the Bank's attempt to respond to the D.C. Circuit's order, in the alternative, that the Bank "adequately consider and explain any adverse effects that these particular Air India loan guarantees have on U.S. industries and U.S jobs."  Ex. 6 at 1.

72.     The Responses were not noticed in the Federal Register.  Neither Plaintiffs nor any other members of the public were given the opportunity to comment on the positions the Bank planned to take in the Responses.

73.     After Plaintiffs inquired as to whether the Board had voted on and adopted the Responses, the Bank's counsel stated that "[t]he responses posted on the Bank's website represent the official response of the Bank to the remand of the Court of Appeals which have been reviewed and commented on by the Bank's senior staff and all members of the Bank's Board of Directors."  The Bank's counsel further stated that "[t]he responses were not the subject of a meeting of the Board of Directors."

74.     The Responses indicate that the Bank has yet to issue any final guarantees in connection with the Air India Commitments.  However, ten of the aircraft covered by the Air India Commitments have already been delivered by Boeing to Air India on the basis of short-term private "bridge" financing.  Ex. 6 at 6.

75.     The Bank expects to issue the final Air India loan guarantees in the "coming months."  Ex. 6 at 6.

**F.     The Responses Are Substantively and Procedurally Deficient**

76.     The Air India Commitments and the Responses are contrary to law because the Bank has still failed to comply with its statutory obligations under the Bank Act.  They are also arbitrary and capricious agency action, an abuse of discretion, and otherwise not in accordance with law because they fail to explain changes in the Bank's positions over time, do not explain or justify the reasons for the Bank's decision, contain numerous substantive errors, and fail to comply with the D.C. Circuit's remand order.

77.     Subparagraphs (a) through (g) below set forth a list of reasons supporting
Plaintiffs' position that the Air India Commitments and the Responses are unlawful.  This list is
illustrative, not exhaustive.  Plaintiffs reserve all rights to provide further reasons in support of
their position, including reasons that may become apparent only upon review of the full
administrative record, to which Plaintiffs do not have access at this time.

a.     The exportable-goods screen is contrary to the Bank Act because it
excludes from any substantive consideration an entire category of adverse effect on U.S.
industry and employment—that is, adverse effect arising from foreign competition in the
provision of services rather than from the production of goods.  That conclusion follows
from the plain language of the Bank Act and is mandated by any reasonable interpretation
of the Bank Act.  Response One further fails to provide a reasoned justification for the
Bank's conclusion that the exportable-goods screen is permissible under the Bank Act,
and is therefore arbitrary, capricious, and in violation of the D.C. Circuit's remand order.

b.     Both Responses assert that the Bank's statutory duty is limited to
considering whether its support "generally result[s] in financing terms for foreign airlines
that [are] more favorable than the financing available to U.S. airlines."  Ex. 5 at 12; *see*
Ex. 6 at 14 (comparing Air India's financing to the private financing available to U.S.
airlines).  But subsidized financing for a foreign airline causes injury to U.S. airlines and
their employees whenever the subsidy permits the foreign airline to obtain more
favorable financing than *that foreign airline* could have received without government
subsidies.  The Bank's contrary position violates the Bank Act and is arbitrary and
capricious.

c.      In Response One, the Bank relies extensively on the argument that U.S. airlines did not raise concerns about the adverse economic effects of the Bank's financing in 2001 or in 2007.  *See* Ex. 5 at 8, 11-12, 14-16.  The Bank, however, fails to explain how that argument supports a refusal to consider the concerns that U.S. airlines raised in 2011, both in the November 1 Letter and on other occasions.  *See* Ex. 2 at 4-6, 8-11; Ex. 5 at 15-16.  The Bank's reliance on U.S. airlines' earlier alleged silence is therefore arbitrary and capricious.

d.      In Response Two, the Bank limits its analysis to the effects of its financing on "direct" competition between U.S. and foreign airlines, meaning competition in which a U.S. airline and a foreign airline compete on the exact same route.  *See* Ex. 6 at 8-10. That limitation excludes the impact of other types of competition, including (for example) competition where a U.S. airline and a foreign airline provide one-stop connecting service to the same international destination, but do not make the connections in the same cities.  The Bank's "direct competition" limitation is contrary to the Bank Act and is arbitrary and capricious.

e.      In Response Two, the Bank departs from the position it had previously taken in 1988 that the potential availability of financing from a foreign export credit agency was irrelevant to the Bank's analysis of whether a transaction produces adverse economic impact.  *See* Export-Import Bank of the United States, Procedures for Economic Impact Analysis at 4 (Nov. 1988), attached hereto as Exhibit 7 and incorporated by reference herein.  Instead, the Bank now not only treats such potentially available financing as relevant, but goes further and *assumes* that such financing exists. Ex. 6 at 4, 13.  The Bank does not acknowledge or explain its change in position; its

failure to do so is arbitrary and capricious.  So is its categorical assumption that such

financing is always available.

f.        In Response Two, the Bank adopts the assumption that there is

no variation across U.S. industries in the amount of foreign content that they utilize when

calculating the amount of U.S. jobs its financing creates.  For example, the Bank assumes

that the aircraft industry uses the same amount of imported steel as the construction

industry).  Ex. 6 at 6-7.  The Government Accountability Office ("GAO") recently

criticized this assumption as a "limitation" of the Bank's approach; the Bank responded

in part by advising GAO that it uses this calculation method "for reporting purposes

only" and "do[es] not use" jobs numbers generated using this assumption "for decision

making."  Government Accountability Office, *Export-Import Bank: More Detailed*

*Information About Its Jobs Calculation Methodology Could Improve Transparency*,

GAO-13-446, at 12, 14 (May 2013), attached hereto as Exhibit 8 and incorporated by

reference herein.  It is arbitrary and capricious for the Bank to tell Congress's auditors

that a calculation technique will not be used for decisionmaking purposes and then seek

to rely on that same technique later in the same year without acknowledging

its limitations.

g.        The Bank concludes that there is "no oversupply in the international

airline market" based in part on a study commissioned by the Bank in 2013 as part of its

decisionmaking process under the 2013 EIPs.  Ex. 6 at 23-24.  When the Bank first

mentioned the possibility that it would conduct such a study on September 27, 2012,

Plaintiffs repeatedly asked for an opportunity to submit comments and information in

support of their position that the Bank's financing has led to long-term oversupply of

passenger aircraft.  *See* Joint Comments of Delta Air Lines, Inc. and Air Line Pilots

Association, International at 11-13 (Oct. 11, 2012), *in* Export-Import Bank of the United

States, Public Comments on the 2012 Proposed Economic Impact Procedures (submitted

Nov. 5, 2012), attached hereto as Exhibit 9 and incorporated by reference herein.  The

Bank did not respond to these requests, did not make the results of its study public, and

did not provide the study to Plaintiffs until December 16, 2013, when it produced the

administrative record in a related case.  *See Delta Air Lines, Inc. v. Export-Import Bank*

*of the United States*, No. 1:13-cv-00424-RC (D.D.C. filed Apr. 3, 2013).[2]  Plaintiffs

further produced a study of their own on the issue and submitted copies of it to the Bank

on June 28, 2013, July 16, 2013, August 19, 2013, and September 4, 2013.  A copy of

Plaintiffs' overcapacity study is attached as Exhibit 10 and incorporated by reference

herein.  The Bank has never responded to Plaintiffs' study and makes no reference to it in

either Response.  It is arbitrary and capricious for the Bank to refuse completely to

consider Plaintiffs' input on this issue of vital importance to the industry.

78.     Because of the procedurally irregular way in which the Responses were adopted,

it is unclear whether the Bank considers them to represent a justification of the Bank's original

authorization of the Air India Commitments in September 2011, or a new authorization of the

transaction in light of all information available as of November 2013.

79.     To the extent that the Bank contends that the Responses are a justification of its

original decision, they are arbitrary and capricious agency action, an abuse of discretion, and

otherwise not in accordance with law because they rely upon data and other materials that

---

[2] Plaintiffs assert on information and belief that the study the Bank produced in *Delta Air Lines,*
*Inc. v. Export-Import Bank of the United States*, No. 1:13-cv-00424-RC (D.D.C. filed Apr. 3,
2013), is the same one it relied on in this case.

postdate the Bank's September 2011 approval of the Air India Commitments and could not have been part of the Bank's decisionmaking process at that time.

80.     To the extent that the Bank contends that the Responses represent a reauthorization of the Air India Commitments, they are contrary to procedure required by law because they were not voted on by the Board at a meeting as required for formal agency action and because they fail to comply with the Reauthorization Act's notice-and-comment provisions, which would apply to any final authorization the Bank purported to undertake in November 2013.  Reauthorization Act § 9(a), 126 Stat. 354-55 (codified at 12 U.S.C. § 635a(c)(10)(C)).

## COUNT I
### The Approval of the Air India Commitments Is in Violation of 5 U.S.C. § 706(2)(C)

81.     All preceding paragraphs are repeated, realleged, and incorporated.

82.     The Bank's approval of the Air India Commitments constitutes final agency action that adversely affects Plaintiffs.

83.     The Bank's approval of the Air India Commitments exceeds Defendants' statutory authority under the Bank Act, the Reauthorization Act, and the APA.

84.     The Court should vacate and set aside the Bank's approval of the Air India Commitments Application under 5 U.S.C. § 706(2)(C).

## COUNT II
### The Approval of the Air India Commitments Is in Violation of 5 U.S.C. § 706(2)(D)

85.     All preceding paragraphs are repeated, realleged, and incorporated.

86.     The Bank's approval of the Air India Commitments constitutes final agency action that adversely affects Plaintiffs.

87.    The Bank approved the Air India Commitments in violation of the procedural requirements of the Bank Act, the Reauthorization Act, and the APA.

88.    The Court should vacate and set aside the Bank's approval of the Air India Commitments Application under 5 U.S.C. § 706(2)(D).

## COUNT III
### The Approval of the Air India Commitments Is in Violation of 5 U.S.C. § 706(2)(A)

89.    All preceding paragraphs are repeated, realleged, and incorporated.

90.    The Bank's approval of the Air India Commitments constitutes final agency action that adversely affects Plaintiffs.

91.    The Bank's actions in approving the Air India Commitments were arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

92.    The Court should vacate and set aside the Bank's approval of the Air India Commitments Application under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Delta, Hawaiian, and ALPA request as relief an order of this Court:

A.    Declaring that Defendants violated the APA by approving the Air India Commitments;

B.    Declaring any action previously taken by the Bank or any Defendant pursuant to the Bank's approval of the Air India Commitments null and void, and setting any such action aside;

C.    Vacating the Bank's approval of the Air India Commitments;

D. Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Bank's approval of the Air India Commitments;

E. Awarding Plaintiffs their reasonable costs, fees, and attorneys' fees incurred in bringing this action; and

F. Granting such other legal and equitable relief as the Court deems just and proper.


Date: January 10, 2014

Respectfully submitted,


/s/ Jonathan B. Hill (by authorization)
Jonathan B. Hill (Bar No. 141473)
COOLEY LLP
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C. 20004-2400
(202) 776-2725
jhill@cooley.com

*Attorney for Plaintiff Hawaiian Airlines, Inc.*

/s/ R. Russell Bailey (by authorization)
Jonathan A. Cohen (Bar No. 952861)
R. Russell Bailey (Bar No. 339093)
David M. Semanchik (Bar No. 502837)
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
1625 Massachusetts Ave., N.W., 8th Floor
Washington, D.C. 20036
(202) 797-4086
Jonathan.Cohen@alpa.org
Russell.Bailey@alpa.org
David.Semanchik@alpa.org

*Attorneys for Plaintiff Air Line Pilots Association, International*

/s/ Michael K. Kellogg
Michael K. Kellogg (Bar No. 372049)
Wan J. Kim (Bar No. 454269)
Gregory G. Rapawy (Bar No. 493973)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@khhte.com
wkim@khhte.com
grapawy@khhte.com

*Attorneys for Plaintiff Delta Air Lines, Inc.*