**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DELTA AIR LINES, INC., *et al.*,              :
                                              :
          Plaintiffs,                         :          Civil Action No.:      14-0042 (RC)
                                              :
          v.                                  :          Re Document Nos.:    12, 14
                                              :
EXPORT-IMPORT BANK OF THE,                     :
UNITED STATES, *et al.*,                      :
                                              :
          Defendants.                         :

**MEMORANDUM OPINION**

**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

The Export-Import Bank ("Ex-Im Bank" or "Bank") is an independent agency

established in 1934 as the official export credit agency ("ECA") of the United States to promote

and facilitate U.S. exports by providing loans and loan guarantees to foreign purchasers of U.S.-

manufactured goods and services.  The U.S. aircraft manufacturing industry is one of many

domestic industries that rely on Ex-Im Bank support to compete with foreign manufacturers that

receive similar support from foreign ECAs.  But while U.S. aircraft manufacturers enjoy the

benefits of the Ex-Im Bank's assistance in selling their planes to foreign airline purchasers, U.S.

commercial airlines, which are not eligible for financing from the Bank, object to the boost that

the Bank's support provides to overseas competitors.

Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), and the Air Line

Pilots Association, International ("ALPA") (collectively, "Plaintiffs") are among those that

protest the Ex-Im Bank's support of foreign aircraft purchasers.  Together, Plaintiffs have

embarked on a multipronged litigation attack against the Ex-Im Bank and its Board of Directors (collectively, "Defendants"), in which they maintain, among other things, that the Bank has violated the Export-Import Bank Act of 1945 ("Bank Act" or "Charter") and the Administrative Procedure Act ("APA") through the adoption and application of certain internal economic impact procedures ("EIPs"), which the Bank uses to assess the economic effects of potential transactions within its broader process of determining whether to approve an application for Bank financing.

This series of litigation began in 2011, when Delta, ALPA, and the Air Transport Association of America challenged the Bank's issuance of loan guarantees to Air India for the purchase of certain Boeing aircraft.  The Bank approved the challenged Air India commitments by applying the then-operative 2007 EIPs, which included an "exportable goods screen" that categorically excluded from detailed economic impact analysis any proposed transaction that would lead to the foreign provision of services, such as airline services, rather than the foreign production of exportable goods.  After the parties filed dispositive motions in that case, Judge Boasberg issued a decision granting summary judgment to Defendants on the basis that the Bank's use of the exportable goods screen to approve the Air India transactions was "neither arbitrary and capricious nor contrary to law."  *Air Transp. Ass'n of Am. v. Export-Import Bank* ("*ATA*"), 878 F. Supp. 2d 42, 47 (D.D.C. 2012).  On appeal, the D.C. Circuit reversed and ordered that the matter be remanded to the Bank, without vacating any of the Bank's actions, for further consideration.  *See Delta Air Lines, Inc. v. Export-Import Bank* ("*Delta I*"), 718 F.3d 974, 978 (D.C. Cir. 2013) (per curiam).

Specifically at issue in this action — one of three separate lawsuits brought by Plaintiffs currently pending before this Court — are the Bank's actions on remand from *Delta I*, which Plaintiffs challenge here on both procedural and substantive grounds.  Defendants and Plaintiffs

each have filed a motion for summary judgment.  Upon consideration of the parties' motions and

the memoranda in support thereof and opposition thereto, the Court will grant Defendants'

motion for summary judgment and deny Plaintiffs' motion.

## II.  BACKGROUND

### A.  Statutory Framework: The Ex-Im Bank And The Bank Act

The Ex-Im Bank is an independent federal agency and corporation that has its origins in a

1934 Executive Order issued by then-President Franklin Roosevelt.  *See* Exec. Order No. 6581

(Feb. 2, 1934).  The Bank assumed its current form with the passage of the Bank Act, ch. 341, 59

Stat. 526, which, as amended and codified at 12 U.S.C. § 635 *et seq.*, remains the Bank's

governing Charter.  The Bank Act declares that "[t]he Bank's objective in authorizing loans,

guarantees, insurance, and credits shall be to contribute to maintaining or increasing employment

of United States workers."  12 U.S.C. § 635(a)(1).  "In connection with and in furtherance of its

objects and purposes, the Bank is authorized and empowered to do a general banking business,"

including "to guarantee, insure, coinsure, and reinsure against political and credit risks of loss."

*Id.*  Loans and loan guarantees issued by the Ex-Im Bank carry the full faith and credit of the

United States government, *id.* § 635k, and Congress has reauthorized the Bank on more than

twenty occasions since 1947.[1]

The Bank Act identifies many policy concerns for the Bank to take into consideration

when deciding whether to approve an application for financing support.[2]  In particular, the

---

[1]       At the time this lawsuit was filed, the Bank Act was slated to expire on September 30, 2014, but Congress has since extended the Act through June 30, 2015.  *See* Pub. L. No. 113-164, § 147, 128 Stat. 1867 (2014).  Thus, as part of that next reauthorization process, Congress will have another opportunity to clearly communicate to all interested parties what role it wants the Bank to play in financing aircraft transactions.

[2]       *See, e.g.*, 12 U.S.C. § 635(b)(1)(B), (D), (E), (H), (K) (declaring that the Bank

statute requires the Bank to "give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports." *Id*. § 635(b)(1)(B)(ii).  The statute also declares that it is "the policy of the United States that loans made by the Bank in all its programs shall bear interest … at rates and on terms and conditions which are fully competitive with exports of other countries, and consistent with international agreements." *Id*. § 635(b)(1)(B).  In addition, the Bank must work with other ECAs to "minimize competition in government-supported export financing." *Id*. § 635(b)(1)(A).

In requiring the Ex-Im Bank to be competitive, Congress has emphasized that the Bank must process financing applications efficiently and with flexibility, so as not to cause a U.S. exporter to lose an export opportunity.  *See id*. § 635(b)(1)(B) (the Bank's loans should "neutralize the effect of … foreign credit on international sales competition"); *see also* S. Rep. No. 99-274, at 8 (1986) (recognizing "the need for [the Bank] to respond to exporters' requests for support in a timely … fashion"); *id*. (noting that the adverse economic impact provision of the Bank Act "should be implemented in a way that does not reduce the Bank's competitiveness and flexibility in assisting U.S. exporters nor ignore the positive aspects of the export sale").

The Bank Act also contains several provisions requiring the Bank and its Board of Directors ("Board") to take into account potential serious adverse effects on U.S. industry and employment when considering a proposed transaction.  Thus, beginning in 1968, Congress has declared that it is the "policy of the United States" that

---

should "supplement and encourage, and not compete with, private capital"; provide loans that are "for specific purposes, and, in the judgment of the Board of Directors, offer reasonable assurance of repayment"; "foster the delivery of United States services in international commerce"; "encourage the participation of small business in international commerce"; "foster the development of democratic institutions and market economies in countries seeking such development, and … assist the export of high technology items to such countries"; and "promote the export of goods and services related to renewable energy sources").

> in authorizing any loan or guarantee, the Board of Directors shall take into account any serious adverse effect of such loan or guarantee on the competitive position of United States industry, the availability of materials which are in short supply in the United States, and employment in the United States, and shall give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports.

12 U.S.C. § 635(b)(1)(B)(ii); *see* Pub. L. No. 90-267, § 1(b), 82 Stat. 47, 47 (1968).  In 1978,

Congress amended the Bank Act to include the provision now codified at 12 U.S.C. § 635a-2,

which calls on the Bank to

> implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries, including agriculture, and employment in the United States, either by reducing demand for goods produced in the United States or by increasing imports to the United States.

*Id.*; *see* Pub. L. No. 95-630, § 1911, 92 Stat. 3641, 3726 (1978).  This provision later was

amended to require the Bank to "address in writing the views of [those] who may be

substantially adversely affected by the loan or guarantee," Pub. L. No. 99-472, § 12, 100 Stat.

1200 (1986), but Congress also specifically provided that "[t]his requirement does not subject the

Bank to the provisions of subchapter II of chapter 5 of title 5," *id.*, which is the administrative

procedure portion of the APA.  *See* 5 U.S.C. §§ 551-59.

In 1986, Congress incorporated § 608 of the Foreign Operations Appropriations Act of

1978, Pub. L. No. 95-481, § 608, 92 Stat. 1591 (1978), into the Bank Act under substantially

similar terms.  *See* Pub. L. No. 99-472, § 11, 100 Stat. 1200, 1203-04 (1986).  The Bank Act thus

provides, among other things, that the Bank may not extend a financial guarantee for the

"production of any commodity for export by any country other than the United States" if the

Board determines that "(i) the commodity is likely to be in surplus on world markets at the time

the resulting commodity will first be sold; or (ii) the resulting production capacity is expected to

compete with United States production of the same, similar, or competing commodity."  12

U.S.C. § 635(e)(1).  Such a limitation does not apply, however, when the Board determines that

the "short- and long-term benefits to industry and employment in the United States are likely to

outweigh the short- and long-term injury to United States producers and employment of the

same, similar, or competing commodity."  *Id*. § 635(e)(3).  Congress has specified that

"substantial injury" occurs when "the amount of the capacity for production established, or the

amount of the increase in such capacity expanded, by" a transaction "equals or exceeds 1 percent

of United States production."  *Id*. § 635(e)(4).

Section 635(e), moreover, provides that "[i]f … the Bank conducts a detailed economic

impact analysis or similar study," it must provide notice and obtain comments on the potential

economic effects of the financing support.  *Id*. § 635(e)(7)(B)(i).  Under this provision, the Bank

also must consider certain factors when conducting a detailed economic analysis.  *See id*. §

635(e)(7)(A).  In addition, Congress requires the Bank to implement such regulations and

procedures as may be appropriate, *see id*. § 635(e)(7)(G), and as it did in § 635a-2, Congress has

provided that "[t]his paragraph shall not be construed to make [the administrative procedure

portion of the APA, 5 U.S.C. §§ 551-59,] applicable to the Bank."  *Id*. § 635(e)(7)(F).

## B.  The 2007 EIPs And The Exportable Goods Screen

In an attempt to comply with its statutory mandate to "take into account" the adverse

impact of its loans and loan guarantees on U.S. industry and employment, the Bank has adopted

EIPs that, among other things, use screens to exempt certain transactions from in-depth

economic impact analysis.  *See* Administrative Record ("AR") at 368-73.  Of relevance here, in

2001 the Bank changed its EIPs to include a new screen that excluded from in-depth review any

"transaction[] that would result in the provision of exportable services from foreign countries"

(the "exportable goods screen").  *See id.* at 371.  By extension, this screen excluded from

economic impact analysis the Bank's financing of foreign aircraft transactions, which the Bank deems to result in the production of exportable services (*i.e.*, airline seats), not exportable goods. *See ATA*, 878 F. Supp. 2d at 77.  The Bank revised its EIPs in 2007 but retained the exportable goods screen.  *See AR* at 356-64 (2007 EIPs).  Thus, from 2001 to 2013, when the Bank again revised its EIPs and adopted the 2013 EIPs and Guidelines, *see id.* at 441-55 (2013 EIPs and Guidelines), the Bank did not conduct in-depth economic analysis regarding the impact of its aircraft financing transactions.[3]

### C.  The 2011 Air India Transactions

Taking a step back, in 2006 the Bank received an application from Air India for two final commitments and two preliminary commitments for loan guarantees totaling almost $6.3 billion that would support Air India's purchase of certain Boeing aircraft.  *See id.* at 33-34.  The Bank's Board approved these transactions on September 28, 2006.  *See id.* at 239-41.  Over the next five years, the 2006 preliminary guarantees were converted into final commitments by a series of unanimous Board votes, and on September 30, 2011, the Board unanimously voted to approve the fourth and fifth conversions of the 2006 preliminary guarantees and to approve a new preliminary commitment.  *See id.* at 278, 352-53.  Specifically, the two final commitments were for "loan guarantees to be issued to a commercial lender (to be chosen by Air India) for loans of up to $1.273 billion for the purchase of new Boeing 787 aircraft by Air India," *id.* at 403-04, and the preliminary commitment was for loans of up to $2.1 billion.[4]  *See id.* at 340, 353.  Because

---

[3]      In September 2012, while *Delta I* was pending, the Bank proposed new EIPs to replace the 2007 EIPs.  *See AR* at 441-55.  On November 19, 2012, the Bank's Board adopted the 2013 EIPs and Guidelines, with an effective date of April 1, 2013.  *See id.* at 1016.  The 2013 EIPs and Guidelines are not at issue in this litigation.

[4]      Defendants argue that the Bank's approval of the 2011 preliminary commitment is not reviewable under the APA because a preliminary commitment is not "final agency action."  *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 14-1, at 18-19 (citing 5 U.S.C. § 704).  In

the exportable goods screen was in effect at the time of these financing authorizations, the Bank

did not perform in-depth economic impact analysis before making any of the commitments.

### D.  *ATA*, *Delta I*, And The Bank's Remand Responses

As noted in the introduction, in 2011 the Air Transport Association of America, ALPA,

and Delta challenged the Bank's loan guarantee commitments to Air India.  *See generally ATA*,

878 F. Supp. 2d 42 (D.D.C. 2012).  After the parties filed dispositive motions in that case, Judge

Boasberg granted summary judgment in favor of Defendants, concluding that the "Bank acted

neither arbitrarily and capriciously nor contrary to its governing statute when it approved the"

Air India transactions using the exportable goods screen.  *Id*. at 54.  Delta and ALPA (but not the

Air Transport Association of America) appealed, and the D.C. Circuit reversed.

In particular, the D.C. Circuit did not determine that the exportable goods screen was

inconsistent with the Bank Act.  *See Delta I*, 718 F.3d at 975.  Instead, the court simply held that

the Bank had "not reasonably explained its justification for the categorical conclusion at issue."

*Id*.  Accordingly, the D.C. Circuit directed the district court "to remand the case to the Bank for

---

response, Plaintiffs raise multiple arguments as to why the Court may consider the preliminary
commitment, including that Defendants forfeited the finality defense by not raising it in *ATA* or
*Delta I*, both of which reviewed the preliminary commitment as part of the court's analysis.  *See*
Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 48-50; *see also Delta I*, 718 F.3d at 975; *ATA*,
878 F. Supp. 2d at 49.  The Court, however, finds that the parties' discussions of the final agency
action issue are both underdeveloped and internally inconsistent at times, and the factual record
regarding preliminary commitments in general also is thin.  Thus, rather than attempting to
untangle this web, which would include analyzing important legal issues that the parties mention
only in passing, the Court finds that the clearest path forward is not to address the finality
question because the answer becomes moot anyways based on the Court's other holdings today.
Specifically, the Bank and the Board treated the preliminary and final commitments in the same
manner by applying the 2007 EIPs.  The Court's decision to uphold the 2007 EIPs therefore
means that the agency acted reasonably when authorizing both types of commitments, which
renders the final agency action question moot.

further proceedings," without vacating the Air India commitments, and the circuit court provided

the Bank with three options on remand:

> (i) attempt to provide a reasonable explanation for how the [2007 EIPs], which
> screen out loans and loan guarantees to service providers, square with the statute's
> requirements, or (ii) adequately consider and explain any adverse effects that
> these particular Air India loan guarantees have on U.S. industries and U.S. jobs,
> or (iii) take whatever other action the Bank deems appropriate to comply with the
> Bank Act and the APA.

*Id.*

The Bank responded to the *Delta I* remand order by preparing and publishing two

documents, entitled Response One and Response Two (collectively, the "Remand Responses").[5]

*See* AR at 365-98 (Response One), 399-440 (Response Two).  Response One was the Bank's

"attempt to provide a reasonable explanation for how the [2007 EIPs] … square with the [Bank

Act's] requirements."  *Id.* at 365.  Alternatively, Response Two attempted to "consider and

explain any adverse effects that these particular Air India loan guarantees have on U.S. industries

and U.S. jobs," *id.* at 399, and it concluded that "the benefits of the Bank's guarantees in the Air

India transactions significantly outweigh any potential adverse effects of such guarantees, if,

indeed, there are any adverse effects."  *Id.* at 404.

### E.  The Present Litigation: *Delta IV*

On January 10, 2014, Plaintiffs filed the present lawsuit, *Delta IV*, challenging the

sufficiency of the Remand Responses on both procedural and substantive grounds, including

that, among other things, the Remand Responses are impermissible *post-hoc* rationalizations not

properly before the Court, Response One fails because the exportable goods screen violates the

---

[5]      *See* Response One, *available at* http://www.exim.gov/about/library/reports/
otherreports/upload/Option-1-Memo-OGC-11-22-13cd-accessible-v2.pdf; Response Two,
*available at* http://www.exim.gov/about/library/reports/otherreports/upload/Option_2_Memo-
OGC-11-22-13-accessible.pdf.

Bank Act, and Response Two fails because the Bank's analysis is arbitrary and capricious.  As a remedy, Plaintiffs request that the Court vacate the loan guarantees issued by the Bank in conjunction with the Air India transactions.  Plaintiffs and Defendants now each have filed a motion for summary judgment.[6]

## III.  LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

Though styled as motions for summary judgment, the dispositive pleadings in this case actually seek the Court's review of administrative action.  The standard set forth in Rule 56(c) therefore does not apply because of the limited role of a court in reviewing the administrative record.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing *Nat'l*

---

[6]    In addition to the present lawsuit, *Delta IV*, two other suits brought by Plaintiffs against Defendants also are pending before this Court.  In *Delta Air Lines, Inc. v. Export-Import Bank*, No. 13-cv-0192-RC (D.D.C. filed Feb. 13, 2013) ("*Delta II*"), Plaintiffs present a facial challenge to the Bank's adoption of the 2013 EIPs and Guidelines.  And in *Delta Air Lines, Inc. v. Export-Import Bank*, No. 13-cv-0424-RC (D.D.C. filed Apr. 3, 2013) ("*Delta III*"), Plaintiffs challenge the Bank's decision to authorize five other aircraft financing transactions that first were approved while the 2007 EIPs were in effect and then were evaluated by the Bank on a voluntary remand under the 2013 EIPs and Guidelines.  As Plaintiffs note, "[t]here is substantial overlap between the arguments made" by the parties in this litigation and in the summary judgment briefing in *Delta III*.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 22 n.10.

*Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. CIV 01-0273, 2005 WL 691775, at *7

(D.D.C. Mar. 23, 2005)); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995),

*amended on other grounds*, 967 F. Supp. 6 (D.D.C. 1997). "[T]he function of the district court is

to determine whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did." *Sierra Club*, 459 F. Supp. 2d at 90 (citation

and quotation omitted). Summary judgment thus serves as the mechanism for deciding, as a

matter of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review. *See Richards v. INS*, 554 F.2d 1173, 1177 (D.C.

Cir. 1977); *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002).

The APA "sets forth the full extent of judicial authority to review executive agency

action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513

(2009). It requires courts to "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). This is a "narrow" standard of review as courts

defer to the agency's expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983). An agency is required to "examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Id.* (internal citation and quotation omitted). The reviewing

court "is not to substitute its judgment for that of the agency," *id.*, and thus "may not supply a

reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp.,*

*Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Nevertheless, a decision

that is not fully explained may be upheld "if the agency's path may reasonably be discerned."

*Id*. at 286; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (a court must "defer to the wisdom of the agency, provided its decision is reasoned and rational").

Finally, a court's review is particularly deferential when a plaintiff challenges agency decisions that balance competing statutory mandates and involve technical, predictive judgments within the agency's special area of expertise.  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (when the agency's analysis "requires a high level of technical expertise," courts "must defer to the informed discretion of the responsible federal agencies" (citation and quotation marks omitted)); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments[.]" (citations omitted)).  "Thus, when an agency's decision is primarily predictive, [a court's] role is limited; [courts] require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive."  *Rural Cellular*, 588 F.3d at 1105.

## IV.  ANALYSIS

Through this lawsuit, Plaintiffs allege that the Bank's Remand Responses should be excluded from the administrative record as *post-hoc* rationalizations, but even if considered part of the record, the responses should be rejected as arbitrary and capricious and contrary to the Bank Act and the Reauthorization Act.  In addition to opposing each of Plaintiffs' arguments for summary judgment, Defendants move for summary judgment on their own behalf by arguing that, among other things, Response One demonstrates why the exportable goods screen is consistent with the Bank Act, and Response Two demonstrates why the Bank's approval of the Air India transactions was not arbitrary and capricious.  Thus, Defendants ask the Court to find that they fully satisfied their obligations under the *Delta I* remand order.

Resolving the parties' motions for summary judgment requires the Court to address numerous textbook questions of administrative law and to grapple with complex economic and financial concepts as they relate to the airline industry. To do so, the Court will proceed as follows. First, the Court addresses whether it may consider the Bank's *Delta I* Remand Responses as part of the administrative record, or whether either of these remand papers must be excluded as a *post-hoc* rationalization. Second, after concluding that both Response One and Response Two are properly part of the administrative record, the Court considers the sufficiency of the Bank's justification for the exportable goods screen, as explained through Response One. And third, the Court addresses Plaintiffs' challenge to the Bank's economic impact analysis of the Air India transactions in Response Two. Ultimately, the Court concludes that Defendants acted reasonably and in accordance with the relevant statutes at all times, thereby satisfying the *Delta I* remand order through both responses. As such, the Court will deny Plaintiffs' motion and enter summary judgment in favor of Defendants.

### A.  Whether The *Delta I* Remand Responses Are Properly Before The Court

A threshold issue that will dictate the rest of the Court's analysis herein is whether Response One and Response Two are reviewable as part of the administrative record. Specifically, in *Delta I*, the D.C. Circuit held that the Bank's decision to approve the Air India transactions could not be sustained because, "at a minimum," the Bank had not "reasonably explained its justification" for the exportable goods screen. *Delta I*, 718 F.3d at 978. The circuit court therefore directed the Bank on remand either to explain how its exportable goods screen "square[s] with the [Bank Act's] requirements," or to "adequately consider and explain any adverse effects that the[] … Air India loan guarantees have on U.S. industries and U.S. jobs." *Id.*

13

Consequently, the Bank prepared Response One, which attempted to justify the adoption of the exportable goods screen, and Response Two, which attempted to explain why the Air India transactions did not result in substantial adverse effects on the U.S. economy.  Plaintiffs now object to the Court considering both responses as part of the administrative record on the basis that the Bank's actions constituted forbidden *post-hoc* rationalizations.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 23-30.  Due to critical underlying differences between Response One and Response Two, the Court addresses each separately.

### 1. Response One

Without doubt, a "fundamental rule of administrative law" is that a court reviewing an agency's decision "must judge the propriety of [the agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  Typically, the grounds reviewed will appear in the administrative record, *see Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990), and judicial review therefore "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  Accordingly, "it is the agency's responsibility, not this Court's, to explain its decision," *State Farm*, 463 U.S. at 57, and if the agency's "grounds are inadequate or improper, the [C]ourt is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Chenery*, 332 U.S. at 196.  It is unsurprising, then, that *post-hoc* rationalizations "have traditionally been found to be an inadequate basis for review" of agency decisions. *Overton Park*, 401 U.S. at 419; *see also Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 617-18 (D.C Cir. 1988) ("Ordinarily,… neither party is entitled to supplement the record with litigation affidavits or other evidentiary material that was not before the agency." (citations omitted)).

At the same time, however, the D.C. Circuit explained in *Alpharma, Inc. v. Leavitt*, 460 F.3d 1 (D.C. Cir. 2006), that *Overton Park* also "approved the procedure of remanding so that an agency can provide an explanation for an inadequately articulated decision." *Id.* at 6. The prohibition against *post-hoc* rationalizations therefore "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning." *Id.* (citation and quotation omitted); *see also Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 n.10 (D.C. Cir. 1974) ("Rule-making is necessarily forward-looking, and by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions. We do not think a court need blind itself to such events[.]"). Further, the Supreme Court has explained that if the administrative "record before the agency does not support the agency action … or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for *additional investigation or explanation*." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added). The Court finds that, through Response One, the Bank offers the exact type of "amplified articulation" and "additional explanation" regarding the basis for the exportable goods screen that the D.C. Circuit demanded in *Delta I*.

Plaintiffs' primary complaint about Response One is that it was not ratified through a vote by the Bank's Board. *See, e.g.*, Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 23. For this proposition, Plaintiffs rely on the D.C. Circuit's decision in *Alpharma*, which held that the rule against *post-hoc* rationalizations "'forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers.'" 460 F.3d at 6 (quoting *Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)). *Alpharma*

thus requires a court to ask whether the party who provided the remand explanation was a "proper decisionmaker" and whether the remand explanation "represent[ed] the considered views of the agency itself." *Id.* at 7.

To establish that a Board vote was required to make Response One legitimate, Plaintiffs rely on § 635(b)(1)(B)(ii) of the Bank Act, which directs the "Board of Directors," when "authorizing any … guarantee," to "take into account any serious adverse effect of such … guarantee on the competitive position of United States industry … and employment." 12 U.S.C. § 635(b)(1)(B)(ii).  But the *Delta I* remand explicitly did *not* require the Bank to issue new *authorizing* decisions for the Air India commitments as if the D.C. Circuit had vacated the original authorizations; rather, the Bank only was ordered to provide further *explanation* on remand in an effort to justify the authorizations that it already had made, not to revisit and reissue those decisions anew.  *See Delta I*, 718 F.3d at 978 (refusing to vacate transactions and ordering that the Bank must "attempt to provide a reasonable *explanation*" justifying the exportable goods screen, or "*explain*" the adverse effects of the Air India loan guarantees (emphasis added)).  As such, the Court finds that § 635(b)(1)(B)(ii) is inapplicable.[7]

---

[7]    By comparison, in *Public Service Commission of New York v. FPC* ("*NY PSC*"), 543 F.2d 757 (D.C. Cir. 1974), and *Braniff Airways, Inc. v. CAB*, 379 F.2d 453 (D.C. Cir. 1967) — cases on which Plaintiffs rely — a formal vote was required when the agency decisions at issue *reconsidered* prior orders by the agencies.  *See NY PSC*, 543 F.2d at 776 ("Only as an entity can the Commission formulate valid original decisions; by the same token, only in that character can it fashion *new decisions remaking* those which it has already promulgated." (emphasis added)); *Braniff Airways*, 379 F.2d at 458 (agency decision reconsidering an order awarding the right to serve a certain route to Eastern Air Lines over its competitor).  Here, the Bank's response to *Delta I* did not "remak[e]" any decisions as to the Air India transactions through the Remand Responses.  Rather, on remand, the Bank provided an explanation through Response One for its adoption of the 2007 EIPs, which in turn supports the Bank's decision to approve the Air India transactions under those EIPs.

The Court, moreover, finds no authority — whether in the APA, the Bank Act, or elsewhere — that requires a formal Board vote adopting Response One when it did not amount to the authorization of a financing decision but rather merely was an explanation of prior decisions.  *Cf. Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011) (when no action by the Commandant or the Secretary of the Department of Homeland Security was required, Coast Guard "official" was found to be a proper decisionmaker); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317, 1325 (D.C. Cir. 1998) (when no action by the Commissioner was required, FDA director was found to be a proper decisionmaker); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 218-19 (D.D.C. 2012) (when no action by the Attorney General was required, DEA Administrator was found to be a proper decisionmaker).

Here, Response One was submitted to the Bank's senior staff and members of the Bank's Board for their review and comments, *see* Defs.' Mem. Opp'n Mot. Summ. J., ECF No. 14-1, Ex. A (E-mails from the Bank's General Counsel), and it was published on the Bank's website on November 22, 2013.  *See* AR at 380.  Response One also makes clear that it represents "the Bank's" experience, judgment, analyses, and conclusions, *see, e.g.*, *id*. at 374, and it was signed and published in the name of the "Export-Import Bank of the United States."  *Id*. at 380. Because Response One clearly was drafted by the Bank and embodies the Bank's official position, the Court finds that, even without a vote by the Bank's Board, the response was prepared by the "proper decisionmaker" and represents "the views of the agency itself."[8]

---

[8]      *Alpharma, Inc. v. Leavitt*, a case on which Plaintiffs heavily rely, supports exactly why Response One is properly before the Court.  In *Alpharma*, the D.C. Circuit considered, and rejected, a challenge very similar to that which Plaintiffs raise here.  460 F.3d at 6-7. Specifically, in the face of a claim that the FDA's response to a prior remand was an impermissible *post-hoc* rationalization, the circuit court held that "[t]here [was] no question that" the Associate Commissioner, who provided the agency's response by letter, "[was] a proper decisionmaker."  *Id*. at 7 (quotation marks omitted).  And as evidenced by the language in the

*Alpharma*, 460 F.3d at 7.  Thus, the Court finds that Response One is a permissible and official

"explanation [on remand] for an inadequately articulated decision," *id.* at 6, and the Court

therefore may consider the response as part of the administrative record.

That being said, Plaintiffs' complaint about the lack of a Board vote was addressed by

Defendants during the course of this litigation.  Specifically, the Bank announced on April 10,

2014, that the Board would vote at its April 17 meeting about "whether to ratify and formally

adopt the [Remand Responses]."  AR at 1143 (agenda for April 17, 2014, Board meeting).  Prior

to the vote, the Bank's staff recommended that the Board adopt the Remand Responses "in

recognition that [they] have represented and continue to represent the official position of the

Bank," and that they "serve as the Bank's official responses to the litigation remands."  *Id.* at

1144; *see also id.* at 1144-46 (April 9, 2014, Board Memorandum).

On April 14, 2014, Plaintiffs submitted a letter and supporting materials to members of

the Board "urg[ing] the Board to reject the [remand papers]."  *Id.* at 1147, 1154.  The Bank's

staff reviewed Plaintiffs' materials and informed the Board that this submission "repeat[ed]

arguments that [Plaintiffs have] made multiple times," both in "the several lawsuits brought by"

Plaintiffs and in "comments" that Plaintiffs "submitted … in connection with various aircraft

transactions."  *Id.* at 1147.  Accordingly, the staff advised the Board that the materials did not

"raise[] anything new that warrant[ed] changing either" the staff's recommendation that the

Board ratify and adopt the remand papers or the substance of the remand papers themselves.  *Id.*

Thus, at its April 17, 2014, meeting, the Board unanimously voted to ratify and adopt the

---

letter — *e.g.*, "Upon review, the *agency* has determined…" — it was clear that the "letter
represent[ed] the considered views of the agency itself."  *Id.* (quotation marks omitted; emphasis
in original).  Similarly here, Response One unquestionably represents the views of the agency,
even prior to the Board's vote.

Remand Responses. *Id.* at 1311. Following the vote, Defendants supplemented the administrative record in this case with the materials relevant to the Board's actions. *See generally* Defs.' Notice Am. Admin. R., ECF No. 18.

In determining the propriety of the Board's vote, the Court finds it significant that in *Delta I*, the D.C. Circuit gave Defendants broad discretion to determine how to act on remand, including the open-ended option to "take whatever other action the Bank deems appropriate to comply with the Bank Act and the APA." *Delta I*, 718 F.3d at 978. This flexibility is consistent with the Supreme Court's pronouncement that, on remand, an agency retains "administrative discretion in deciding how, in light of internal organizational considerations, it may best proceed," and a reviewing court therefore "may not … dictat[e] to the agency the methods, procedures, and time dimension of the needed inquiry[.]" *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976); *see also Chenery*, 318 U.S. at 95 (explaining that the prohibition on *post-hoc* rationalizations is not intended to "enforc[e] formal requirements" or to "suggest[] that the [agency] must justify its exercise of administrative discretion in any particular manner or with artistic refinement"). Plaintiffs, however, ask the Court to violate this proscription by dictating specific procedures that the Bank should have followed in regard to when and how the Board voted, but the Court declines to do so absent any clear legal foundation for imposing such rules. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 541 (1978) ("[A]bsent extraordinary circumstances it is improper for a reviewing court to prescribe the procedural format an agency must follow[.]"); *see also Perez v. Mortg. Bankers Ass'n*, --- S. Ct. ---, No. 13-1041, 2015 WL 998535, at *7 (Mar. 9, 2015) (discussing the "longstanding principle[] of … administrative law jurisprudence" that "[b]eyond the APA's minimum requirements, courts lack authority 'to impose upon [an] agency its own notion of which

procedures are 'best' or most likely to further some vague, undefined public good'" (citation omitted)).  As such, the Board's vote leaves no doubt that Response One represents the official position of the agency, and the vote further justifies why the Court should consider it here.

*Food Marketing Institute v. ICC*, 587 F.2d 1285 (D.C. Cir. 1978), another case on which Plaintiffs rely, also does not compel the Court to ignore Response One.  That decision's warning against "[p]ost-hoc rationalizations by the agency on remand," *id.* at 1290, occurred after the court already had concluded that the agency's position was "defective" — not just insufficiently explained, as in *Delta I* — and the court therefore had "vacated" the decision — in contrast to remand without vacatur in *Delta I.  See id.* at 1288.  The agency then issued a new decision reaching the same conclusion as in the decision previously vacated, leading the D.C. Circuit to caution that

> [t]he agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result.  Post-hoc rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review.

*Id.* at 1290 (citation omitted).  This statement therefore addresses the potential problem of closed-mindedness when an agency is required to make a new decision on remand, which is different than the circumstances here, where the *Delta I* remand occurred in order for the agency to provide a fuller articulation of its reasoning in support of prior decisions that themselves were left undisturbed.[9]

---

[9]     Plaintiffs also rely on *AFL-CIO v. McLaughlin*, 702 F. Supp. 307 (D.D.C. 1988), where the district court concluded that a remand response constituted an impermissible *post-hoc* rationalization because it referenced studies published after the date of the agency's original decision.  *Id.* at 311.  In reaching this conclusion, the district court primarily relied on *Food Marketing Institute v. ICC*, 587 F.2d 1285 (D.C. Cir. 1978).  But *Food Marketing Institute* never held that an agency could not rely on more recent information on remand; instead, the case merely cautioned that "[t]he agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result."  *Id.* at 1290.  Thus, it appears to the Court that not only did *McLaughlin* misconstrue its legal support, but its conclusion also remains in

Finally, Plaintiffs suggest that *Chenery* prevents the Court from considering Response One, but the Court disagrees.  *Chenery* stands for the proposition that when Congress has delegated "a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment."  *Chenery*, 318 U.S. at 88.  Consistent with *Chenery*, it often is stated that "the courts may not accept … counsel's *post hoc* rationalizations for agency action."  *State Farm*, 463 U.S. at 50; *see also Women Involved in Farm Econ.* ("*WIFE*") *v. U.S. Dep't of Agric.*, 876 F.2d 994, 998 (D.C. Cir. 1989) (explaining that *Chenery* "ordinarily prevents agency counsel from proffering alternative theories — not explicitly embraced by a department or agency head — to support a challenged regulation").  But here, there is no issue of counsel for the Bank presenting *post-hoc* rationalizations because Response One was prepared by the agency, not its counsel.[10]

---

conflict with *Alpharma*, which held that the prohibition against *post-hoc* rationalizations "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning."  460 F.3d at 6-7 (citation and quotation omitted).

[10]       *Chenery* and the prohibition on *post-hoc* rationalizations also may be inapplicable for a second reason: "if an agency [has] no obligation to explain its actions contemporaneously, … the entire record, or a good part of it, is actually created for the sole purpose of judicial review" such that "much that is presented to the court is developed *post-hoc*."  *WIFE*, 876 F.2d at 999.  As Judge Boasberg noted in *ATA*, it appears that the Bank is not subject to the APA's notice-and-comment rulemaking procedures when it formulates new EIPs, including the APA's requirement in 5 U.S.C. § 553(c) that an agency publish "a concise general statement of [the] basis and purpose" of its actions.  *See ATA*, 878 F. Supp. 2d at 73.  In such circumstances, the "core consideration that supports *Chenery* — that the *agency* rather than the *judiciary* supply the reasons for issuing a rule so as not to interfere with the agency's future deliberations" — is inapplicable.  *WIFE*, 876 F.2d at 1000 (emphasis in original).  Accordingly, the D.C. Circuit has noted the lack of any case "in which the Supreme Court has applied *Chenery*'s proscription against crediting counsel's explanations to the review of agency action exempt from the APA's requirement of a contemporaneous explanation of the action's basis or purpose."  *Id.* at 999 (collecting cases).  Instead, courts "accept[] … *post-hoc* justifications when [the] agency making [the] rule had no duty to make a record."  *Lever Bros. Co. v. United States*, 877 F.2d 101, 105 (D.C. Cir. 1989) (citing *WIFE*, 876 F.2d at 998-1000).  Plaintiffs here do not challenge Judge

In sum, the Court concludes that Response One provides the type of "amplified articulation" that an agency is permitted to — and, here, required to by the D.C. Circuit — provide on remand; accordingly, examination of Response One's contents is perfectly appropriate.[11] *See Alpharma*, 460 F.3d at 6 ("Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives."); *Local 814*, 546 F.2d at 992 ("The policy of the post hoc rationalization rule does not prohibit the [agency] from submitting an amplified articulation [for its actions].  Moreover, the logic of the rule requires it.  If a reviewing court finds the record inadequate to support a finding of reasoned analysis by an agency and the court is barred from considering rationales urged by others, only the agency itself can provide the required clarification.").

### 2. Response Two

Although the Board unanimously voted to ratify and adopt both Remand Responses at the same time, a different analysis is required for Response Two.  This is because unlike Response One, which attempted to justify the exportable goods screen that the Bank used to approve the Air India commitments, Response Two provided an alternative justification for approving those commitments separate from the 2007 EIPs.  As a result, the Court cannot say that Response Two provided an "amplified articulation" of the agency's reasons for adopting the exportable goods screen and, in turn, for originally authorizing the Air India commitments.  *Alpharma*, 460 F.3d at 6.  Rather, Response Two offers a new reason for why the agency *could* have approved the commitments irrespective of the exportable goods screen.  Thus, under most circumstances,

---

Boasberg's statement in *ATA* that the Bank was not required to engage in notice-and-comment procedures when it adopted the 2007 EIPs.

[11]      To hold otherwise as to Response One would render illogical the D.C. Circuit's remand order in *Delta I* calling for further analysis, as this Court would effectively be punishing the Bank and the Board for doing exactly what the circuit court ordered it to do.

Response Two would run afoul of the prohibition on *post-hoc* rationalizations because it offers a justification for authorizing the Air India commitments that was not considered by the agency at the time the decision was made.  *See, e.g.*, *State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996), *aff'd in part and remanded sub nom.*, *Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997) (a prohibited *post-hoc* rationalization occurs when an agency "present[s] a new basis for its action," rather than merely offering a "clearer or more detailed explanation" for its action, only the latter of which courts usually may consider on remand).

The Court, however, is not convinced that such a conclusion is appropriate here.  In *Delta I*, the D.C. Circuit did not vacate the Air India commitments or require the Bank to reconsider or re-open its decisionmaking concerning these loan guarantees.  In this context, if the D.C. Circuit did not want the Bank to provide an explanation on remand that the agency did not consider at the time of the original authorizations, the court could have given the Bank a simple remand option: attempt to justify the exportable goods screen, and if you cannot do so, re-decide the Air India commitments using a new analysis that is consistent with the Bank Act and that does not rely on the exportable goods screen.  Such a remand order would avoid a *post-hoc* rationalization by requiring the agency to either further explain its original justification (*i.e.*, the exportable goods screen) or make a new authorizing decision on remand using a different justification; the agency could not, however, provide a new justification for its initial decision to authorize the Air India commitments.  But *Delta I* did not take that approach.

Instead, the D.C. Circuit gave the Bank the options on remand to "adequately consider and explain any adverse effects that these particular Air India loan guarantees have on U.S.

industries and U.S. jobs," which is what Response Two attempted to do, "or [to] take whatever other action the Bank deems appropriate to comply with the Bank Act and the APA." *Delta I*, 718 F.3d at 978.  By granting options beyond just further explaining the exportable goods screen, the circuit court permitted the agency to provide an alternative, *post-hoc* justification on remand for the Air India commitments without reconsidering the decisions themselves.  Thus, given *Delta I*'s explicit pre-approval of the *post-hoc* option that the Bank attempted to take through Response Two, this Court finds that it is proper to consider here the agency's response.  *See Alpharma*, 460 F.3d at 6 ("Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives.").  Indeed, any other conclusion would place this Court in direct conflict with *Delta I* by ignoring a potential alternative justification for the Air India commitments that the D.C. Circuit evidently wanted a district court to consider when evaluating a future challenge to the agency's remand actions, which is exactly the type of lawsuit now before this Court.

### B.  Response One: Plaintiffs' Challenge To The Exportable Goods Screen

Having settled that Response One is properly before the Court, the Court next turns to evaluating whether the Bank's adoption of the exportable goods screen as part of the 2007 EIPs was contrary to the APA or the Bank Act.  In particular, Defendants ask the Court to find that the screen was the product of the Bank's well-reasoned determination that transactions in which the export was to be used by the foreign purchaser to provide a service — and not to produce an exportable good — were unlikely to cause a substantial or serious adverse economic impact on U.S. industry and employment.  *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 14-1, at 30.  Plaintiffs, however, disagree that the exportable goods screen represents the culmination of

rational agency decisionmaking and instead contend that the screen cannot be reconciled with the

Bank Act.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 37.

Turning to Plaintiffs' substantive challenge, the Court begins, as it must, with the relevant

statutes.  In particular, Plaintiffs maintain that the exportable goods screen does not reasonably

serve the Bank Act's objectives, as proclaimed through three related provisions.  First, § 635

specifies that, among other considerations, the agency "shall take into account any serious

adverse effect of [a proposed] loan or guarantee on the competitive position of United States

industry … and employment in the United States, and shall give particular emphasis to the

objective of strengthening the competitive position of United States exporters and thereby of

expanding total United States exports."  12 U.S.C. § 635(b)(1)(B)(ii).  Second, the Bank Act

provides that the agency "may not extend [financing support] for establishing or expanding

production of any commodity for export by any country other than the United States[] if … the

Bank determines that the extension of such [support] will cause substantial injury to United

States producers of the same, similar, or competing commodity," *id*. § 635(e)(1), unless "in the

judgment of the Board of Directors of the Bank, the short- and long-term benefits to industry and

employment in the United States are likely to outweigh the short- and long-term injury to United

States producers and employment of the same, similar, or competing commodity."  *Id*. §

635(e)(3).  And third, the Bank Act requires that the "Bank shall implement such regulations and

procedures as may be appropriate to insure that full consideration is given to the extent to which

any loan or financial guarantee is likely to have an adverse effect on industries … and

employment in the United States."  *Id*. § 635a-2.

Though these provisions utilize somewhat different language, it is undisputed that, taken

together, they require the Bank to consider (or, more accurately, "take into account") the

potential adverse effects of its loans and loan guarantees on U.S. industry and employment. Plaintiffs insist, however, that the Bank, through the exportable goods screen, ignores this fundamental statutory mandate altogether.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 38 (the "exportable-good screen was effectively a refusal — announced in advance — to consider statutorily mandated factors in the vast majority of transactions that the Bank approved.").  Such failure, Plaintiffs contend, renders the Bank's decision to approve the Air India commitments under the 2007 EIPs arbitrary and capricious.  *See, e.g.*, *Overton Park*, 401 U.S. at 416-17 (agency acted arbitrarily and capriciously when decision was not "based on a consideration of the relevant factors" and failed to "follow[] the necessary procedural requirements"); *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1989) (agency acted arbitrarily and capriciously due to "complete absence of any discussion" of statutorily required element).  Defendants, on the other hand, argue that consideration of the statutorily mandated factors occurred at the time the 2007 EIPs were adopted and then applied to the Air India transactions.  *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 14-1, at 37-38.  The Court, then, must decide whether the institution and application of the exportable goods screen sufficed to discharge the Bank's obligations under the Bank Act.  In the end, the Court finds that the screen represents a reasonable attempt by the Bank to comply with its modest statutory obligations.  Accordingly, the Court finds in favor of Defendants.

## 1.  Standard Of Review

To determine whether the exportable goods screen is a permissible construction under the Bank Act, the Court first must determine how much deference is owed to the agency.[12]

---

[12]     The Court notes initially that it is the exportable goods screen, which expresses the Bank's interpretation of the Bank Act, and not Response One itself that is owed deference. In deciding whether the Bank has provided a reasoned explanation for its interpretation and has

Defendants argue that the Bank is entitled to the level of deference afforded by the framework set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 14-1, at 22.  Plaintiffs, however, assert that the two-step *Chevron* analysis is inapplicable.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 36.

It is well established that "not all statutory interpretations by agencies qualify for [*Chevron*] deference."  *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659 (D.C. Cir. 2003) (citations omitted).  Thus, the Supreme Court has explained that "[d]eference in accordance with *Chevron* … is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  But as Judge Boasberg noted in *ATA*, there is no "clear answer" about whether *Chevron* deference should apply to the Bank's creation of the exportable goods screen. *See ATA*, 878 F. Supp. 2d at 72 ("The application of [the *Gonzales*] standard to the EIPs … does not yield a clear answer.").

This is because, on the one hand, Congress clearly delegated to the Bank and the Board broad authority to make loan guarantees such as those at issue here, *see* 12 U.S.C. § 635(a)(1),

---

not acted arbitrarily and capriciously, the Court looks to Response One and the rest of the administrative record.  *See Menkes*, 637 F.3d at 330-33 (deferring to the agency's statutory interpretation articulated on remand, "especially given the instruction from this court to the agency to come to grips with the meaning of the statute" (quotation marks and citation omitted)). As such, Plaintiffs' argument that Response One is not entitled to deference because it "has never been adopted by the Board as its own reasoning" was unnecessary, and anyways, the argument became moot when the Board voted to adopt the Remand Responses in April 2014. *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 36.

(b)(1), and Congress also required the agency to "take into account" certain factors — such as potential "serious adverse effect[s]" of a transaction, *id*. § 635(b)(1)(B)(ii), and whether a transaction would "cause substantial injury" to U.S. industries, *id*. § 635(e)(1)(B) — when determining whether to approve or deny an application for financing.  Congress, moreover, explicitly directed the Bank to "implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries."  *Id*. § 635a-2.  Congress therefore left it to the agency to determine how "adverse effects" should be analyzed, and the exportable goods screen represents the agency's judgment as to matters within its area of expertise.  *Cf. Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (applying *Chevron* because of, *inter alia*, the "interstitial nature of the legal question" and the "related expertise of the Agency").

On the other hand, the 2007 EIPs plainly are not the product of "either a notice-and-comment rulemaking or a formal adjudication, the usual suspects for *Chevron* deference."  *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 (D.C. Cir. 2008); *see also Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) ("If the agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, we give the agency's interpretation *Chevron* deference.").  Though "'the want of' notice and comment 'does not decide the case'" against *Chevron* deference, *see Barnhart*, 535 U.S. at 222 (quoting *Mead*, 533 U.S. at 230-31), it also is not certain that the 2007 EIPs carry the force of law.  Instead, the EIPs might more accurately be described as non-binding internal guidelines — akin to "'interpretations contained in policy statements, agency manuals, and enforcement guidelines,'" which historically are "beyond the *Chevron* pale," *Mead*, 533 U.S. at 234 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)) — rather than the formal and binding

legislative rules that usually benefit from *Chevron* deference. *See Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("[E]ven if an agency has acted within its delegated authority, no *Chevron* deference is due unless the agency's action has the 'force of law.'" (quoting *Mead*, 533 U.S. at 227)).

Ultimately, then, this Court finds itself at the same impasse as Judge Boasberg in *ATA* regarding what level of deference is owed to the Bank's interpretation of the Bank Act through the EIPs. *See ATA*, 878 F. Supp. 2d at 72-73 (examining, but ultimately not deciding, whether *Chevron* applies to the exportable goods screen). And like in *ATA*, this Court finds that it is unnecessary to resolve the enigmatic *Chevron* question because "to hold that an agency decision 'do[es] not fall within *Chevron* is not … to place [it] outside the pale of any deference whatever.'" *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Mead*, 533 U.S. at 234; alterations in *Fox*). Instead, even when an agency's interpretation of its governing statute is not entitled to *Chevron* deference, courts still give credit to agency interpretations to the extent such credit is due. *See id.* Specifically, consistent with the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "'[t]he weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140; second alteration in *Mead*).

After consideration of the *Skidmore* factors, this Court, like that in *ATA*, finds that the exportable goods screen deserves considerable deference. *See ATA*, 878 F. Supp. 2d at 73 (*Skidmore* "considerations counsel in favor of lending significant weight to the interpretation of §§ 635(b)(1)(B) and 635a-2 set forth in the [2007] EIPs"). Though amendments have occurred

from time-to-time to reflect new considerations imposed by Congress, the Bank has used comprehensive EIPs in some form since 1979 as a framework for evaluating potential transactions.[13]  *See* AR at 368-69.  During this period, the Bank accumulated decades of expertise regarding the airline sector and other industries, and critically, the Bank has long used that expertise to develop various procedural filters, including the exportable goods screen, that block from further in-depth analysis categories of transactions that the Bank, in its considered judgment, deems to be unlikely to produce a substantial adverse impact on domestic industry and employment.  *See id.* at 375.  These procedures, moreover, are crafted within the sparse guidelines provided by Congress regarding *how* the Bank should consider the various competing statutory mandates in the Bank Act, which, in turn, gives the agency substantial discretion to use its expertise to fill in those gaps as it sees fit.  *See ATA*, 878 F. Supp. 2d at 73 ("[T]he question of how 'adverse effects' on domestic industry and employment should be identified and weighted is squarely within the category of inquiries the Ex-Im Bank's expertise puts it in the best position to answer.").  Thus, the Court concludes that, at the very least, the Bank's interpretation of the Bank Act through the exportable goods screen, which "represent[s] the culmination of multiple generations of Bank officials' expertise," *id.*, deserves significant deference.

---

[13]     The Bank has, for many decades, implemented EIPs to screen out transactions that it predicted were unlikely to have serious adverse effects on U.S. industry.  *See* AR at 375. Thus, early on, the Bank determined that the best way to do so was by categorizing transactions that had certain characteristics — which the Bank's expertise indicated were unlikely to result in a substantial adverse effect domestically — and exclude those transactions from further in-depth economic impact review.  *Id.*  For example, in the Bank's first set of EIPs from 1979, the Bank determined that exports involving certain kinds of capital equipment (*e.g.*, locomotives) and certain projects (*e.g.*, power plants) were not likely to have any serious adverse impact domestically because they resulted in foreign localized goods or services with only local economic effects.  *See id.* at 368-69.

2.  The Bank's Use Of A Categorical Screen Generally

Before reaching the merits of the exportable goods screen itself, the Court first must address Plaintiffs' argument that *any* categorical screen that prevents in-depth economic analysis for certain transactions is inconsistent with the Bank Act because such a screen does not, in and of itself, afford "full consideration" to the factors mandated by Congress.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 37 (arguing that "the exportable-good screen does not contemplate any examination of economic impact in services transactions at all").  Indeed, in many ways, Plaintiffs' complaint appears to be primarily that the Bank should never use categorical screens and should instead subject all, or maybe just nearly all, pending transactions to in-depth economic impact analysis.  The Court finds that such an argument is inconsistent with both the Bank Act and the prior court decisions addressing this issue.

Specifically, as Judge Boasberg recognized in *ATA*, "multiple provisions of the Bank Act contemplate [the possibility of] categorical decisionmaking."  *ATA*, 878 F. Supp. 2d at 74.  For example, § 635a-2 requires that the agency "implement such *regulations and procedures* as may be appropriate to insure … full consideration" of adverse effects, 12 U.S.C. § 635a-2 (emphasis added), which indicates that the Bank was not just permitted to develop a policy for making "adverse effects" determinations, but rather that it was expected to do so.  In addition, § 635(e)(7)(A) provides that certain procedural requirements apply only "*[i]f* … the Bank conducts a detailed economic impact analysis."  *Id*. § 635(e)(7)(A) (emphasis added).  Congress's use of the conditional language "if" strongly suggests that detailed economic impact analysis is not expected to be performed for every financing decision, which, in turn, implies that the Bank may create procedures for distinguishing between those transactions that require detailed analysis and

those that do not.[14]  *See ATA*, 878 F. Supp. 2d at 80 ("Nothing in § 635(e)(7) supports Plaintiffs'

contention that the Bank is obligated to perform detailed economic-impact analyses for every

transaction.").

Further, the D.C. Circuit in *Delta I*, in reliance on the plaintiffs' litigation position there,

appeared to treat this question as a foregone conclusion accepted by all parties:

> The dispute here arises because the procedures *categorically* determine that loans
> and loan guarantees to foreign *service* providers will not affect U.S. industries and
> U.S. jobs.  *Delta acknowledges that categorical assessments are permissible
> under the Act in appropriate circumstances*….  The real disagreement between
> the parties, then, is whether the Bank's categorical assessment of the impact of
> loans and loan guarantees to foreign service providers is a reasonable application
> of the Bank Act[.]

*Delta I*, 718 F.3d at 978 (citation omitted; third emphasis added).  In addition, given the volume

of applications the Bank receives each year — approximately 3,800 in Fiscal Year 2012, for

example, *see* AR at 374-75 — it would be nearly impossible for the Bank to accomplish its

statutory mission of promoting U.S. exports if it were required to perform in-depth economic

analysis for every transaction, or even for a significant percentage of transactions.  *See id.* at 374

(detailed economic impact analysis "can substantially delay the processing of a transaction and

jeopardize the ability of the U.S. exporter to capture the export opportunity"); *id.* at 374-75

(given the thousands of applications the Bank receives each year, "the Bank would not be able to

accomplish its mission of promoting U.S. exports if it were to perform a 'detailed economic

---

[14]      This also is confirmed by the legislative history of the Bank Act, which provides
that

> the Committee recognizes the need for [the Bank] to respond to exporters'
> requests … in a timely and confidential fashion and intends that the Bank
> implement its adverse economic impact analysis procedures in a practical and
> workable fashion.  *The bill does not require the Bank to conduct further analysis
> if it views its existing body of knowledge as sufficient.*

S. Rep. No. 99-274, at 8 (1986) (emphasis added).

impact analysis' on every transaction, or even for a significant percentage of the transactions").

Indeed, the Bank very likely would grind to a halt if such an approach were mandated by this

Court, which cannot reasonably be considered consistent with the Bank Act's purpose.  *See, e.g.*,

12 U.S.C. § 635(b)(1)(B) (it is "the policy of the United States … to support United States

exports at rates and on terms and conditions which are fully competitive with exports of other

countries"); *cf. United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("When

[one possible statutory] meaning has led to absurd or futile results … this Court has looked

beyond the words to the purpose of the act."); *United States ex rel. Davis v. District of Columbia*,

34 F. Supp. 3d 30, 49 (D.D.C. 2014) ("When faced with two potential interpretations of the

statutory phrase …, one of which leads to an absurd conclusion, the Court is on firmer ground

interpreting the statute to avoid that absurdity." (citations omitted)).

The Court, moreover, simply is not persuaded by Plaintiffs' argument that the Bank, by

applying a categorical screen rather than performing individual analyses, fails to consider a

factor required by the Bank Act.  Instead, this Court agrees with *ATA*, where Judge Boasberg

rejected a similar argument, explaining that

> [b]y instituting a series of screens intended to identify those transactions most
> likely to pose a significant risk of "adverse effects," the Bank "ensure[d] that all
> transactions are screened for economic impact implications" while simultaneously
> reserving its limited resources for "those cases that require further economic
> impact analysis through a more extensive process."

*ATA*, 878 F. Supp. 2d at 75 (citations omitted).  Similarly, the Court in *ATA* found that

> Plaintiffs' allegation that the screens serve to remove "transactions from *any*
> consideration for *any* adverse impacts," entirely mischaracterizes their operation.
> *When the EIPs operate to exempt applications from more in-depth analysis, that*
> *does not mean that the Bank did not consider the adverse effects of those*
> *transactions.*  Instead, by applying its EIPs, the "Bank reviews all transactions it
> receives for potential economic impact."

*Id.* (citations omitted; third emphasis added).  Likewise here, the Court finds that both the initial

decision that resulted in the institution of the EIPs and their subsequent application to individual

transactions qualify as consideration of "adverse effects."  Accordingly, this Court, like those in

*ATA* and *Delta I*, concludes that the Bank is authorized to adopt categorical screens in an attempt

to limit further analysis to only those transactions that are "likely to have an adverse effect on

industries … and employment in the United States."[15]  12 U.S.C. § 635a-2.

Finally, Plaintiffs criticize the exportable goods screen because it removed nearly 92% of

all applications for Bank financing from in-depth economic impact analysis.  *See* Pls.' Mem.

Supp. Mot. Summ. J., ECF No. 12-1, at 38 (citing AR at 474, 504-06).  If Congress desired to

make detailed economic impact analysis mandatory for a greater percentage of transactions, it

certainly was free to do so.  But instead, Congress has left it to the Bank to determine both how

the "adverse effects" of a transaction ought to be identified and when an in-depth inquiry is

merited.  In addition, that few transactions meet the Bank's criteria for requiring a detailed

---

[15]     The use (and approval) of categorical screens is not unique to the Bank.  For
example, in *Lopez v. Davis*, 531 U.S. 230 (2001), a plaintiff challenged a Bureau of Prisons
("BOP") regulation that categorically excluded from eligibility for early release those inmates
convicted of a felony involving a firearm.  The underlying statute had identified one class of
inmates ineligible for early release and additionally had provided that the BOP "may" reduce
sentences for other inmates.  The plaintiff argued that the BOP could not delineate a new
category of ineligible inmates (*i.e.*, all firearm offenders) in addition to those already identified
by Congress, but rather must make a case-by-case determination as to each inmate's eligibility.
*Id.* at 239.  The Supreme Court disagreed: "The [BOP] is not required continually to revisit
issues that may be established fairly and efficiently" by rendering a single, categorical decision.
*Id.* at 244 (citation and quotation marks omitted).  Rather, the BOP had "reasonably concluded"
that firearm offenders, as a group, were unlikely to deserve early release, and the BOP therefore
could exclude all such offenders without a further, individual evaluation.  *Id.*  As the Supreme
Court explained, even when a statutory scheme requires "individualized determinations," the
agency may have the authority to rely on categorical judgments "unless Congress clearly
expresses an intent to withhold that authority."  *Id.* at 241, 244 (citation and quotation omitted).
This Court finds no such clear intent in the Bank Act to restrict the Bank's authority in that
regard.

economic impact analysis does not, by itself, compel the Court to find that the Bank's line

drawing was arbitrary and capricious or contrary to the Bank Act.[16]  *See WorldCom, Inc. v. FCC*,

238 F.3d 449, 462 (D.C. Cir. 2001) (courts are "generally unwilling" to question agency line

drawing "unless a petitioner can demonstrate that lines drawn … are patently unreasonable,

having no relationship to the underlying regulatory problem" (citation and quotation omitted)).

### 3.  Merits Of The Exportable Goods Screen

The critical question thus becomes whether the line drawn by the Bank in adopting the

exportable goods screen was "a reasonable policy choice for the agency to make," or whether the

agency's decision was arbitrary and capricious or contrary to the Bank Act, as Plaintiffs claim.

*See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005)

(citation and quotation omitted).  To answer this question, the Court feels compelled to start by

noting that the Bank Act creates far more questions than it answers regarding how the Bank

should implement the statutory scheme.  Indeed, the obligations imposed on the agency by the

Bank Act are, at best, modest and, at worst, riddled with gaps that must be filled by the Bank.

For instance, how is the Bank to determine whether serious adverse effects on U.S. airlines are

likely to result from the Bank's provision of financing support to a foreign airline intending to

purchase a U.S.-manufactured aircraft?  And, for that matter, what meaning should the Bank give

to statutory terms such as "serious" in § 635(b)(1)(B)(ii) or "likely" in § 635a-2?

Competing statutory considerations also are at play.  For example, without question, the

Bank's fundamental mission is to support U.S. jobs by facilitating U.S. exports, which, in turn,

---

[16]       Judge Boasberg rejected a similar argument raised by the plaintiffs in *ATA*, concluding that "[i]f Congress wishes to make detailed economic-impact analyses mandatory for a greater percentage of — or for certain categories of — transactions, it may certainly do so." *ATA*, 878 F. Supp. 2d at 77.

requires the Bank's financing to be "fully competitive" with foreign ECAs' support of their own exports. *See* 12 U.S.C. § 635(a)(1) (the Bank is "to contribute to maintaining or increasing employment of United States workers"); *id.* § 635(b)(1)(B)(ii) (the Bank is to "give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports"); *id.* § 635(b)(1)(B) (Bank loans shall include rates, terms, and conditions that are "fully competitive with exports of other countries, and consistent with international agreements"). And in requiring the Bank to be "fully competitive," Congress emphasizes that the Bank must process financing applications efficiently so as to prevent a U.S. exporter from losing an export opportunity. *See id.* § 635(b)(1)(B) (the Bank's loans should "neutralize the effect of … foreign credit on international sales competition"); *see also* S. Rep. No. 92-51, at 2 (1971) (the Bank Act affords the Bank "broad authority to manage and finance its operations in the most economical and efficient manner in order to meet the changing export credit needs of the U.S. exporter"). In fact, even when Congress added a provision regarding adverse economic impact, it still emphasized "the need for [the Bank] to respond to exporters' requests for support in a timely … fashion," and directed that the Bank "implement[]" the provision "in a way that does not reduce the Bank's competitiveness and flexibility in assisting U.S. exporters nor ignore the positive aspects of the export sale." S. Rep. No. 99-274, at 8 (1986); *see also* Pub. L. No. 99-472, § 11, 100 Stat. 1200, 1203-04 (1986) (codified at 12 U.S.C. § 635(e)(1)).

Thus, the Bank has construed Congress's intent, as relayed through the Bank Act, to be that the Bank must evaluate "transactions efficiently so as not to impede the transactions, which often need to proceed expeditiously to capture the export opportunity," and must "focus its adverse impact analysis only on those instances where the potential adverse effect is substantial."

AR at 366.  The Bank Act, though, does not answer *how* the Bank should balance these

competing obligations, and the exportable goods screen is the Bank's attempt to perform that

balancing.  *See id.* at 371; *see also Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C.

Cir. 1999) ("When an agency must balance a number of potentially conflicting [statutory]

objectives,… judicial review is limited to determining whether the agency's decision reasonably

advances at least one of those objectives and its decisionmaking process was regular." (citation

omitted)).  Though the Court finds this to be an eminently reasonable interpretation of what the

Bank Act demands from the Bank when processing financing applications, such an

understanding does not resolve whether the categorical goods screen itself represents rational

agency decisionmaking.[17]

Answering that question is complicated, but in attempting to do so, significant deference

is owed to the agency.  In particular, by allowing the Bank to adopt categorical screens, the Bank

Act implicitly leaves to the Bank the responsibility for making difficult predictive judgments

about the potential economic effects of its future loans and loan guarantees.  At the same time,

the gaps and ambiguities in the Bank Act also leave it to the Bank to apply its experience and

technical expertise regarding the impact of its financing decisions on specific domestic industries

in making this prediction.  In such situations, the D.C. Circuit has described the APA's arbitrary

---

[17]      Significantly, the Bank Act does not require the Bank to determine whether
aircraft financing will *never* harm U.S. airlines.  Instead, the question is one of probability, not
certainty.  *See* 12 U.S.C. § 635a-2 (requiring the Bank to consider "*likely* … adverse effect[s]"
(emphasis added)).  Categorical screens are one mechanism for making that prediction in an
efficient manner, as the Bank Act demands.  *Cf. Critical Mass Energy Project v. Nuclear
Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (noting that in Freedom of Information
Act ("FOIA") jurisprudence, "[t]he Supreme Court has encouraged the development of
categorical rules whenever a particular set of facts will lead to a generally predictable application
of FOIA," and "'[o]nly by construing the [FOIA] Exemption to provide a categorical rule can
[FOIA]'s purpose of expediting disclosure by means of workable rules be furthered'" (quoting
*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 779 (1989))).

and capricious standard as "particularly deferential." *AD HOC Telecom. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (arbitrary and capricious "standard is particularly deferential in matters such as this, which implicate competing policy choices, technical expertise, and predictive market judgments" (citations omitted)); *see also Rural Cellular*, 588 F.3d at 1105 ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments[.]" (citations omitted)). "Thus, when an agency's decision is primarily predictive, [a court's] role is limited; [courts] require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive."[18] *Rural Cellular*, 588 F.3d at 1105 (citation omitted).

### a. *Expertise, Experience, And The Bank's Understanding Of The Aircraft Financing Market*

The Court now turns, at last, to considering the Bank's justifications for the exportable goods screen. As a preliminary matter, Plaintiffs immediately question the level of the Bank's expertise, arguing that Response One offers only general statements about the Bank's experience rather than meaningful evidence to establish the agency's expertise and experience in understanding the aircraft financing market. *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 18. The Court recognizes that, given the exportable goods screen's categorical exclusion, the Bank has not, until recently, subjected aircraft financing transactions to in-depth economic

---

[18]     The legislative history of the Bank Act supports the Court's conclusion that the Act was intentionally drafted to give considerable leeway to the Bank in crafting its internal procedures for financing transactions. For example, legislators initially proposed that the Bank "should … not authorize" financing support "which may have serious adverse effects" on U.S. industry and employment, S. Rep. No. 93-1097, at 19 (1974) (emphasis omitted), but § 635(b)(1)(B) was amended to its current form, including the requirement that the Board "shall take" such adverse effects "into account," not that the Bank cannot authorize a transaction when adverse effects may exist. *See* S. Conf. Rep. No. 93-1335, at 3, 8 (1974). Thus, what began as a prohibition became, in the final version, merely one factor among many to be considered.

impact analysis.  The Bank does, however, have much experience with global financial markets generally and the aircraft financing market in particular.

Of note, the Bank has evaluated financing transactions across numerous industries under various economic impact provisions for more than forty-five years, with the Bank reviewing upwards of several thousand applications for financing in any given year.  *See* AR at 374.  In addition, both before and after the adoption of the exportable goods screen in 2001, the Bank has been directly involved in negotiations with other ECAs regarding evolving iterations of the Aircraft Sector Understanding ("ASU"), which is an agreement between multiple ECAs, including the Bank, to establish the official financing terms and conditions that ECAs can offer for wide-body aircraft transactions.  *See id*. at 374, 377.  Further, as Response One explains, the Bank gained much experience with the aircraft financing market leading up to the adoption of the exportable goods screen in 2001 through its financing of 440 U.S.-manufactured aircraft between 1990 and 1999, which totaled an export value of approximately $22 billion.  *See id.* at 376.  Thus, the Bank has been active in the aircraft financing market for many years, which, along with its longstanding role in financing transactions and evaluating economic impact in other industries, establishes the agency as knowledgeable and experienced in this area.

Turning to the Bank's explanation for the exportable goods screen, the Bank understood from the hundreds of aircraft transactions it has financed that, for many years, U.S. airlines generally had access to financing at costs that were more favorable than the costs of aircraft financing provided by ECAs, such as the Ex-Im Bank.  *See id*. at 374.  For example, the Bank understood that U.S. airlines often had access to favorable financing tools — such as leveraged

leases[19] and enhanced equipment trust certificates ("EETCs")[20] — that were not available to

foreign airlines at the time and that were more favorable than the cost of financing provided by

the Ex-Im Bank and the European ECAs.  *See id.* at 376-77; *see also id.* at 383-89 (discussing

financial tools available to U.S. airlines).  Because of these alternatives, the Bank has long

predicted that U.S. airlines were unlikely to be harmed by Ex-Im Bank financing to foreign

airlines, as U.S. airlines usually had access to more favorable, or at least equally as favorable,

financing than the Bank was providing.[21]  *See id.* at 379-80.

     Additionally, in the area of aircraft financing, certain member countries of the

Organization for Economic Cooperation and Development ("OECD"), including the United

States, have entered into a series of agreements, the ASU, regarding ECA financing for aircraft.

---

[19]     In contrast to ECA financing, in the 1980s and 1990s the main method used by U.S. airlines to acquire aircraft was a leveraged lease.  *See* AR at 376.  A leveraged lease provides tax benefits to an entity that wants to shelter income through additional tax deductions.  *See id.*  That entity purchases the aircraft and then leases it to the airline, and the purchaser, as the owner, thus can take the depreciation deductions and investment tax credits during the term of the lease.  *See id.*  The Bank's experience revealed that, for multiple reasons, leverage leases were a favorable financing tool in comparison to Ex-Im Bank financing.  *See id.*

[20]     EETCs allow creditors to provide more favorable financing terms to U.S. airlines than those available to foreign airlines because of the unique protection of § 1100 of the U.S. Bankruptcy Code.  *See* AR at 376-77, 401.  It is only recently that an international EETC market has begun to develop because of the Cape Town Convention — for which, interestingly, it appears that Air India is not eligible.  *Id.* at 401 n.7.

[21]     Importantly, the Bank need not establish that U.S. airlines *always* can secure better financing on private markets, nor has the Bank made such an assumption here.  *Cf.* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 27 (mistakenly arguing that the Bank assumes in Response One "that American carriers could *always* secure better financing on private markets").  Instead, it is sufficient for the Bank to use its experience and expertise to make assumptions about financing conditions *generally*, rather than establishing absolutes; that is the very point of categorical screens, and such an approach is consistent with the Bank Act's mandate that the Bank determine if adverse effects are "likely," not if such effects will never occur.  *See Lopez*, 531 U.S. at 244 (upholding categorical screen when BOP "reasonably concluded" that certain factors "suggest[]" an inmate should not get early release, and not requiring BOP to prove that such inmates are always bad candidates for release).

*See id.* at 377.  The ASU in place around 2001 established the most favorable terms and

conditions that ECAs could offer for the sale or lease of aircraft, and those terms and conditions,

in the Bank's experience, resulted in financing that was "significantly more expensive than that

which could be obtained by U.S. airlines in the private market."  *See id.*  The Bank therefore

understood that when it first adopted the exportable goods screen in 2001, its own financing

terms, as set by the then-applicable ASU, were significantly more expensive than the terms

available privately to U.S. airlines, and as such, the Bank anticipated that its financing would not

pose serious adverse economic harm to U.S. airlines at that time.  *See id.*

Plaintiffs nonetheless criticize Response One as relying on "unstated inferences" or

"unsupported assertions."  *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 18.  Not so.  As

the Court just discussed, the Bank developed substantial experience regarding the international

and domestic aircraft financing market over the years and leading up to the adoption of the

exportable goods screen, and the specific facts learned by the Bank during this time led it to

reach the well-supported and reasonable conclusion that aircraft financing applications did not

require further in-depth analysis because such financing transactions were unlikely to harm U.S.

airlines, which themselves had superior financing alternatives available.  The Bank's predictive

judgment — which the Bank Act implicitly requires by focusing on the *likely* adverse effects of a

transaction, *see* 12 U.S.C. § 635a-2, and not asking the Bank to determine that a transaction

*never* will have any harmful effect — is entitled to substantial deference.

b.  *Lack Of Industry Complaints, Changing Market Conditions, And Continued Use Of The*

*Exportable Goods Screen*

Response One also explains that the Bank regularly sought input from industry

stakeholders, representatives, and government agencies to help the Bank determine whether its

41

actions were consistent with its fundamental mission of supporting U.S. jobs and exports without causing likely, serious adverse effects on the U.S. economy.  *See* AR at 367, 375.  The Bank believed that such individuals and entities could be relied on to notify the Bank if they became concerned that certain policies or actions threatened to harm a specific domestic industry or sector.  *See id.* at 375.  Thus, industry representatives' and stakeholders' concerns — or, more aptly, the lack thereof — were one tool that the Bank used to evaluate (and reevaluate if necessary) the soundness of its categorical judgments.  *See id.* ("In the Bank's experience," trade groups, industry stakeholders, and other government agencies "could be relied upon to notify the Bank if they were concerned that the Bank's policies … threatened to cause any harm … to a specific industry or sector.").  The Court finds no error in the Bank's decision to rely on such sophisticated and highly interested actors, such as Plaintiffs, for feedback regarding the agency's decisionmaking and predictive judgments over the course of time.

On this point, the Bank reports that when the exportable goods screen first was adopted in 2001, the Bank had not heard any concerns from U.S. airlines regarding adverse economic impact from a Bank financing decision in the last seventeen years (since Pan American World Airways ("Pan Am") complained in 1984), *see id.* — or, for that matter, in the decade following the screen's adoption as well.  *See id.* at 376.  The Bank relied on this lack of complaints from industry stakeholders, including Delta and Hawaiian, as further evidence confirming the accuracy of its assessment that U.S. airlines were not experiencing a material financing disadvantage in aircraft transactions as compared to the foreign airlines that received ECA financing.[22]  *See id.* at 375.

---

[22]  The *Delta II-IV* series of litigation appears to support the Bank's position that most U.S. airlines still do not object to the exportable goods screen, as only Delta and Hawaiian have joined these lawsuits, not the Air Transport Association of America or any of its other

Plaintiffs, however, assert that Response One does not sufficiently explain why the Bank

continued to use the exportable goods screen into 2007, or why the Bank kept using the screen at

the time of the Air India commitments.  *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at

19-20.  Without doubt, an agency's "latitude to make policy based upon predictive judgments

deriving from its general expertise … implies a correlative duty to evaluate its policies over

time[.]"  *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (citations omitted).  But here, the

Court disagrees with Plaintiffs' contention, as Response One clearly explains that the Bank

retained the exportable goods screen in the 2007 EIPs and through the adoption of the 2013 EIPs

and Guidelines because, despite changes in the dynamics of the aircraft financing market (and

still without any industry complaints for much of this time), the Bank's continued expertise and

experience indicated that the screen remained an accurate, effective, and efficient tool for

evaluating proposed aircraft financing transactions.

For instance, Response One explains that the terrorist attacks of September 11, 2001,

resulted in a sudden and protracted reduction in demand for airline passenger services.  *See* AR

at 378.  As a result of that decrease in demand, as well as other financial pressures at the time,

U.S. airlines began a decade-long process of consolidation through mergers and bankruptcies.

*See id.*  Thus, with limited exceptions, U.S. airlines generally did not purchase new passenger

aircraft during this period, such that any financing advantage that the Ex-Im Bank purportedly

was providing to foreign airlines during this period remained purely theoretical.  *See id*.  And, at

the same time, the Bank's keen awareness of the aircraft financing market continued to indicate

that U.S. airlines still typically had access to financing that was "no less favorable than financing

---

member airlines.

provided by ECAs[.]" *See id*.  Under such circumstances, the Court finds that the Bank had no reason to adjust its procedures.

Starting in 2005, moreover, the various countries and constituencies that were involved with ECA aircraft financing, including multiple U.S. airlines, began negotiating a new ASU.  *See id*.  When the new ASU was agreed to in June 2007, the European airlines, many of which had previously alleged that ECA financing was, in fact, more favorable than the financing they could obtain in the private market, agreed that the new ASU no longer posed any ECA financing advantage.  *See id*.  At the same time, none of the U.S. airlines expressed any economic impact concerns about the new ASU.  *See id*.  Thus, with this new ASU in place and with no other significant changes to the aircraft financing market, the Bank again had no reason to believe that a different approach was required through 2007.  *See, e.g.*, *id.* ("All of the other relevant factors that led to the adoption of the 'exportable goods' screen in 2001 remained true in 2007.").

Response One further explains that the worldwide financial crisis that first emerged in 2008, as well as the European sovereign debt and banking crises that emerged soon after, also had a major impact on global financial markets, including those for aircraft purchases.  *See id*. at 378-79.  During this period, there continued to be little demand for acquiring new passenger aircraft by U.S. airlines, while there was significant growth in the demand for wide-body aircraft in the emerging markets and resource-rich OECD countries.  *See id*. at 379.  Plaintiffs fail to explain how any of these changing conditions suddenly required the Bank to reconsider the exportable goods screen, or why that screen was no longer an effective tool for complying with and achieving the goals of the Bank Act.

For these reasons, the Court is not persuaded by Plaintiffs' argument that Response One relied on outdated information to explain why the Bank continued to use the exportable goods

screen through 2007 and beyond, as the Bank has thoroughly explained the factors that it took

into consideration and why it did not make any change to its procedures sooner.  Given this

period of market volatility, the minimal demand for new passenger aircraft by U.S. airlines, the

continued lack of industry complaints, and the Bank's understanding that U.S. airlines still

generally had access to more favorable financing, the Court finds that the Bank was reasonable

to conclude that a different approach was not required.

### c. The First Industry Complaint In 2010

Next, Plaintiffs argue that by 2010, one U.S. airline — Delta — had complained about

the financing the Bank was providing to foreign airlines, which, according to Plaintiffs, should

have led the Bank to eliminate the exportable goods screen — particularly given the Bank's

reliance in Response One on the fact that it had heard no complaints from industry stakeholders

prior to 2010.  *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 19.  The Court, however,

finds that the Bank has justified its decision to maintain the exportable goods screen in the face

of this industry complaint for at least two reasons: first, the Bank found little merit in the U.S.

airline's complaint that financing provided by the Bank to a European airline, Ryanair, was more

favorable than the financing available to the U.S. airline; and second, the Bank understood that,

in 2010, negotiations among the ECAs for a new ASU would address any perceived cost

advantage because the clear aim of the revised ASU was to ensure the equivalency of ECA and

commercial bank financing.

Turning to the first point, in early 2010 the Bank received a complaint from one U.S.

airline asserting that financing provided by the Bank to Ryanair, a discount European carrier, was

more favorable than the financing available to the U.S. airline.  *See* AR at 379.  Plaintiffs argue

that this complaint should have led the Bank to eliminate, or at least reconsider, the exportable

goods screen. *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 19. The Bank, however, has

provided a well-reasoned explanation for why this complaint was unfounded: after receiving the

complaint, the Bank determined that Ryanair had a better credit rating and was using a superior

quality of collateral, namely new aircraft, as compared to the credit rating of the complaining

U.S. airline and the relatively older aircraft that the U.S. airline was using as collateral. *See* AR

at 379. These two factors created a material difference in the cost of financing for Ryanair

versus that for the complaining U.S. airline, thus discrediting Plaintiffs' analysis as comparing

"apples-to-oranges."[23] *See id.*

    Second, at around the same time, the complaining U.S. airline also had expressed

concerns in the context of the new ASU negotiations. *See id.* The Bank, however, anticipated

that the negotiations among the ECAs for a new ASU would address any cost advantage because

the plain purpose of the new agreement was to ensure the equivalency of ECA and commercial

bank financing. *See id.* at 379-80. The ECAs ultimately reached a new agreement at the end of

2010, and the new ASU went into effect on February 1, 2011. *See id.*; *see also id.* at 1073-119

(2011 ASU). The 2011 ASU contained mechanisms for adjusting to changes in the private

---

[23]    Specifically, Ryanair sought to *purchase* seven *new* Boeing 737-*800* aircraft, as
compared to Delta's *refinancing* of two *2009* Boeing 737-*700* aircraft. *See* AR at 379. As the
Bank explains (and as basic accounting principles make evident), the financing costs with new
airplanes as collateral will be lower than the costs when refinancing with older, less-desirable
airplanes as collateral. *See id.* at 379, 779. In addition, Plaintiffs' analysis incorrectly compares
financing costs for Delta, a non-investment grade airline at the time, with costs for Ryanair, an
investment grade foreign airline, which also accounts for part of the difference in financing costs,
as different credit ratings obviously will lead to different lending terms. *See id.* at 379, 779.
Plaintiffs' assertions that Delta and Ryanair had "similar" credit ratings and that the aircraft were
"similar" simply are not accurate. (Also absent from Plaintiffs' comparison were the other terms
and conditions imposed by the Bank on Ryanair, which restricted the airline's liquidity and
altered the ultimate financing costs, including, for example, the requirement of cross-
collateralization among all the aircraft in Ryanair's fleet financed by the Bank. *See* Defs.' Mem.
Supp. Mot. Summ. J., ECF No. 14-1, at 34 n.20; *see also* AR at 413 n.14 (discussing cross-
collateralization requirement for Air India transactions).)

financial markets as they occur, thus ensuring that ECA financing and private bank financing remained functionally equivalent.  *See id*. at 379-80; *see also id*. at 1076 (one purpose of the 2011 ASU is "to establish a balanced equilibrium" that "[a]voids distortion of competition among the Participants to this [ASU] and any other sources of financing").  Accordingly, at the time the Air India transactions at issue in this case were approved (September 2011), the new ASU, which became effective in February 2011, *see id*. at 379-80, had been in place for a short period of time, and there was no reason to doubt that it was functioning as intended.

Overall, then, when the Bank received a complaint in 2010, it considered the U.S. airline's claims and concluded that the complaint was unfounded and did not require revisiting the exportable goods screen.  Further, the mere fact that a U.S. airline, for the first time in nearly two decades, disagreed with the Bank's longstanding judgment about the economic impact of financing aircraft transactions did not, by itself, give the Bank reason to discontinue using the exportable goods screen.[24]  *Cf. State Farm*, 463 U.S. at 42 ("an agency changing its course … is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance").  Indeed, to hold otherwise would place the Bank at the whim of the U.S. airline industry, rather than allowing the Bank to carry out its statutory mandate within the broad and forgiving contours provided by Congress.  *See West Virginia v.*

---

[24]     The Court points out that although the exportable goods screen did not undergo notice-and-comment procedures, interested parties still had other opportunities to provide input to the Bank in the absence of such formalities.  *See, e.g.*, AR at 372 (discussing the Bank's consultation process with U.S. industry, labor, exporters, relevant experts, and government agencies, as well as the Bank's Advisory Committee); *cf*. Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 39-40 (complaining that the Bank did not engage in notice-and-comment procedures, but failing to explain why such procedures were required by statute).  As proof, the Bank has received complaints from U.S. airlines in the past, including a complaint in 1984 from Pan Am and the more recent complaint from Delta.  *See* AR at 375.

*EPA*, 362 F.3d 861, 867 (D.C. Cir. 2004) ("agency determinations based upon highly complex and technical matters are entitled to great deference" (quotation marks and brackets omitted)).

### d. The Proper Comparison For Determining Adverse Impact Under The Bank Act

Finally, Plaintiffs argue that the Bank should measure the potential advantage Ex-Im Bank financing may provide to foreign airlines by comparing the difference between the Bank financing available to the foreign airline and the private market rate that the foreign airline would have received absent Bank support; the Bank, on the other hand, compares the cost of ECA financing available to the foreign airlines with the cost of financing that might be available to U.S. airlines.[25]  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 51-52 & n.32; Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 23.  According to Plaintiffs, if the foreign airline did not have access to the Bank's financing, U.S. airlines would be in a better position to compete and to hire more employees, and when the availability of Bank financing removes that advantage, U.S. airlines and their employees suffer.  *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 23.  This argument, however, appears to rely on two broad assumptions, neither of which holds up under closer scrutiny: first, if a foreign airline uses Ex-Im Bank financing support, that must mean the Bank's financing is cheaper than that which the foreign airline could

---

[25]     The Court notes that Plaintiffs in this case have flipped their position from prior litigation, as the plaintiffs in *ATA* recognized that the Bank's approach represented the correct comparison.  *See* Am. Compl., *ATA*, No. 11-cv-2024, ECF. No. 35, ¶ 6 ("The Ex-Im Bank's aggressive approach to aircraft financing allows foreign airlines to borrow at much cheaper rates *than domestic airlines*." (emphasis added)); ATA's Mem. Supp. Mot. Summ. J., *ATA*, No. 11-cv-2024, ECF No. 32, at 8 (arguing that the Bank "guarantees loans for foreign airlines to purchase new aircraft at rates substantially lower *than U.S. airlines receive* in the open market," and that "[t]hose below-market rates give foreign airlines *competitive advantages over U.S. airlines*" (emphasis added)); *see also ATA*, 878 F. Supp. 2d at 57 ("[T]he Bank's financing of foreign airlines' aircraft purchases allow[ed] foreign airlines to borrow *at better terms than Delta and other domestic airlines*." (emphasis added)).  Such inconsistencies serve to undermine Plaintiffs' arguments and highlight the ambiguity in the Bank Act.

otherwise obtain in the private market; and second, the foreign airline's alleged financing cost

advantage over U.S. airlines from Bank financing — an advantage that the Bank explains does

not exist in the first place — necessarily causes the type of harm that is relevant under the Bank

Act.  Ultimately, the Court finds that the Bank's approach is reasonable under the Bank Act,

despite Plaintiffs' preference for an alternative methodology that surely would be more favorable

to them.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir.

2011) (judicial review of an agency's selection of alternatives requires "considerable deference

to the agency's expertise and policy-making role," and courts must avoid an "unreasonably

narrow definition of objectives that compels the selection of a particular alternative" (internal

citations and quotation marks omitted)).

 Initially, Plaintiffs' argument appears to assume that the existence of Ex-Im Bank

financing, by itself, induces foreign airlines to purchase new aircraft and thus increase

competition with U.S. airlines.  Such a conclusion, however, is inconsistent with the fact that the

pricing advantage offered by Bank financing, if any, most likely is immaterial in the larger

context of the costs for purchasing, operating, and maintaining wide-body passenger aircraft.

*See* AR at 420-21.  As the Bank explains, a single Boeing 787 aircraft costs approximately $116

million to purchase and approximately $40-$70 million to operate annually, *see id.* at 419 n.26,

420, which translates to more than $1 billion over the course of its expected 25-year lifetime.

*See id.* at 421.  When compared to the hypothetical interest savings per year from Bank support

— approximately $482,000 in the case of the Air India transactions, for instance — the Bank's

experience has revealed that "[n]o prudent airline would make an investment of that magnitude,

and take on such massive operating costs, based solely on the theoretical savings in financing

costs."  *Id.* at 420; *see also* Boeing's Amicus Curiae Br., ECF No. 19, at 19 ("In Boeing's

experience, the Bank was correct in concluding that '[i]t is highly unlikely that' the availability of [ECA] financing 'would induce an airline to make a purchasing decision of this magnitude.'" (citation omitted)).  The record therefore contradicts Plaintiffs' presumption that the availability of Ex-Im Bank financing sways foreign airlines to purchase new aircraft they otherwise would not acquire, thereby causing an increase in competition with U.S. airlines that otherwise would not exist.  Rather, the availability of Bank financing — or the lack thereof — is more likely to affect only the secondary decision of whether to purchase aircraft from Boeing or Airbus when a specific need for new planes arises.  *See* AR at 421.  Thus, Plaintiffs' underlying assumption, that U.S. airlines necessarily face less competition if the Bank does not provide financing to foreign airlines, falls apart.

This ties into another problem with Plaintiffs' alternative comparison: it overlooks the fact that in the market for large commercial aircraft, there are only two manufacturers in the world — Boeing and Airbus — and purchases of Airbus aircraft are supported by three European ECAs (France, Germany, and the United Kingdom).  *See id.* at 390, 420-21.  As a result, once a foreign airline decides to purchase a new plane to meet a specific need, the airline has a binary choice: purchase a U.S.-manufactured Boeing airplane (potentially financed by the Ex-Im Bank), or purchase a foreign-manufactured Airbus airplane (potentially financed by a European ECA). *See id.* at 420 ("Given the competition from Airbus on every sale, supported by the three European ECAs, Ex-Im Bank financing affects only the *sourcing* of an aircraft, not the decision or ability of a foreign airline to purchase an aircraft." (emphasis in original)).  And if Ex-Im Bank financing is removed from the equation, the Bank's experience has revealed that foreign airlines simply will purchase from Airbus instead of Boeing due to the presence of foreign ECA financing.  *Id.* at 402.  As the Bank explains,

> [i]n such case, the foreign airline will most likely still purchase an aircraft, but it will be a European-manufactured Airbus aircraft; and it will most likely still use that European-manufactured Airbus aircraft in the same manner as it would have if it had purchased a U.S.-manufactured Boeing aircraft with Ex-Im Bank support. Indeed, many of the foreign airlines that have received Ex-Im Bank support readily switch between Boeing and Airbus and have a mixed fleet of Boeing and Airbus aircraft. Even the very few foreign airlines that traditionally have only either Boeing or Airbus aircraft can be persuaded to switch.

*Id.* Thus, Plaintiffs' approach is misguided because, by focusing on the benefit a foreign airline might receive from commercial market financing, it ignores the fact that, in the absence of Bank financing, the foreign airline still will compete with U.S. airlines to the same degree by purchasing Airbus aircraft with foreign ECA financing.[26] The Bank Act, however, is concerned only with Bank financing that is *likely* to cause *serious* harm to the domestic economy, which is not the case when the presence or absence of Bank financing only alters the aircraft sourcing decision, not the amount of overall competition, such that the only reasonably likely effect from the absence of Bank financing is the loss to the U.S. economy from fewer aircraft manufacturing opportunities.[27]

---

[26] Plaintiffs attempt to undermine Defendants' assumption that foreign airlines will readily switch between Airbus and Boeing planes by arguing that certain airlines still will purchase Boeing planes regardless of whether Bank financing is available because these airlines maintain all-Boeing fleets for various reasons. *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 50 n.31 ("[T]here was a substantial period of time during which Airbus did not have a production-ready substitute for the Boeing 787."); Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 43 n.35 ("[T]here are Boeing-only fleets which continue to receive Bank support."); AR at 737 ("[S]ome foreign airlines do not use Airbus airplanes."). Though a few airlines may maintain Boeing-only fleets, that fact only shows that there may be some limited exceptions to the general rule, but the Bank is required to make its assessments based on likelihoods, not certainties. In addition, that an airline has declined to purchase Airbus planes in the past does not guarantee that it will not do so in the future. *See* Boeing's Amicus Curiae Br., ECF No. 19, at 20 ("[I]n today's ultra-competitive climate, even historically sole-source airlines will switch from Airbus to Boeing, as Air Canada did earlier this year, and from Boeing to Airbus, as Japan Airlines did last year when it signed a purchase agreement for 31 Airbus A350 airplanes.").

[27] Of course, "because the Bank is designed to facilitate U.S. exports in a competitive global market, it is inevitable that all of its transactions could be said to have ripple effects on the U.S. economy." AR at 407 n.12. The Bank Act, however, does not prohibit Bank

The Bank instead focuses on the cost of ECA financing available to the foreign airline in order to make certain that the Bank's financing is competitive with that from foreign ECAs such that export opportunities are funneled (through Boeing) to the U.S. economy and not lost to Airbus.  *Cf.* Boeing's Amicus Curiae Br., ECF No. 19, at 21-22 (in 2012, European ECAs "supported an estimated 147 Airbus airplanes valued at over $10 billion.  These agencies are not burdened by the onerous requirements that Plaintiffs demand here." (citation omitted)).  Plaintiffs' comparison, on the other hand, ignores the reality that, except when Bank financing is likely to cause serious harm domestically (which the Bank has shown is not the case here), the Bank Act's goal is to ensure that competition between Boeing and Airbus occurs based on the price and quality of the aircraft, not the availability of ECA financing.  *See, e.g.*, 12 U.S.C. § 635(a)(2) (specifying procedures that the Bank must follow in order for it "to be competitive in all of its financing programs *with countries whose exports compete with United States exports*" (emphasis added)); AR at 402 ("[a] key determinant is whether foreign ECA support would be available for financing the sales of a foreign competitor to the proposed U.S. exporter");  *see also* Boeing's Amicus Curiae Br., ECF No. 19, at 25 ("Plaintiffs' approach ignores the fact that commercial financing is not the true alternative for foreign airlines denied Bank support; rather, such airlines will simply take advantage of the financing offered by any of the three European [ECAs] to purchase Airbus planes instead.").  Accordingly, the Court finds that the Bank's comparison is reasonable under the statute.

A final assumption by Plaintiffs is that if a foreign airline uses Ex-Im Bank financing, it must mean that the Bank's financing was cheaper than that which the foreign airline could have

---

financing that will have just any effect on competition, as Plaintiffs' argument appears to assume.  Instead, the statute mandates that the Bank focus its assessment only on transactions *likely* to cause *serious* adverse economic impact.

obtained in the private market.  The accuracy of this assumption, however, largely is negated by the 2011 ASU, which included mechanisms intended to align ECA financing costs with those available in the private market in order that a foreign airline using ECA financing does not obtain a financing cost advantage.[28]  *See* AR at 379-80.  Plaintiffs nonetheless argue that their own experts have concluded that foreign airlines still obtain substantial cost advantages from ECA financing even under the 2011 ASU, which would contradict the Bank's position that the ASU has been effective in achieving its goal.  *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 25-26; AR at 778-80.  The Court is not persuaded by Plaintiffs' argument for two reasons.

First, the Court already has addressed the Ryanair transaction, and in short, nothing about Plaintiffs' analysis discredits the Bank's understanding of the aircraft financing industry or the effectiveness of the 2011 ASU, as the Bank has demonstrated why Plaintiffs' analysis of the Ryanair transaction is flawed and not compelling.[29]  *See* Part IV.B.3.c., *supra*.  The Court notes,

---

[28]     It remains possible that when the size of a transaction is very large, or when private lenders have reached certain lending limits, there may not be private lenders willing or able to undertake the risk, and the foreign airline therefore would need to turn to an ECA.  In such circumstances, the Bank ensures that Boeing does not lose the export opportunity to Airbus, which is supported by the European ECAs.  But even in this situation, it does not necessarily follow that the foreign airline is gaining a financing cost advantage *over U.S. airlines* from Bank financing.  In addition, once a foreign airline buys an Ex-Im Bank financed aircraft, it still may never use the aircraft to compete directly with U.S. airlines, and as is explained in Part IV.C.2., *infra*, the Bank reasonably has determined that only direct competition threatens the type of "serious" adverse economic impact contemplated by the Bank Act.  For example, Air India does not fly any of the Bank-financed Boeing 787 aircraft at issue in *Delta I* to the United States, which led the Bank to conclude in Response Two that the Air India commitments did not seriously harm U.S. airlines.  *See* AR at 405.

[29]     Plaintiffs also cite a declaration from a Delta official stating that he conducted an "apples-to-apples comparison" between Delta's EETCs and Ryanair's purchase of new aircraft, "including similar credit ratings, identical collateral, and similar financing dates" in June and November 2010.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 40 n.17 (citing AR at 796-98).  Such analysis, however, appears to fail to account for the revised 2011 ASU, which was drafted to eliminate the financing discrepancies about which Plaintiffs complain.  In addition, Plaintiffs' declaration does not state whether Delta's private financing again concerned the refinancing of *older* aircraft, which, if true, would render the comparison meaningless.  *See*

though, that because airlines continue to use ECA financing at times, those airlines must expect

some benefit to having ECA support such that a difference still seems to exist between ECA

financing and private market financing despite the revised ASU.  Of course, sometimes private

market financing simply is not available to an airline for whatever reason, which explains the

obvious preference for ECA financing in those situations.  At the same time, Plaintiffs have not

brought to the Court's attention any specific transaction conclusively establishing that a material

financing gap actually does exist between the two financing sources, as the only comparisons the

Court finds in the record are the Ryanair comparison, which dealt with financing issued before

the new ASU and which the Court has found unpersuasive for other reasons, and the Air India

comparison in Response Two, which likewise is not persuasive because it provides only a

hypothetical analysis.  Thus, in spite of the Court's slight unease about the actual effectiveness of

the new ASU, the Court finds no basis to overturn the Bank's judgment, particularly given that

the Bank continues to monitor the relationship between ASU-level financing and commercial

market financing.  *See* AR at 379-80 ("The Bank continues to monitor the 2011 ASU to ensure

that the adjustment mechanism built into that agreement does, in fact, generally work to enforce

an equilibrium between the cost of ECA aircraft financings and the financing available to U.S.

airlines in the private market.").

Second, Plaintiffs' argument ties into a larger theme that is prevalent throughout this

litigation: many of Plaintiffs' complaints about the Bank are, at base, an attempt to provoke a

battle of the experts.  But such a battle is frowned upon within the context of an APA challenge

to agency decisionmaking.  *See Marsh*, 490 U.S. at 378 ("When specialists express conflicting

---

*also* n.21, *supra*, explaining why the Bank need not find that U.S. airlines always can obtain
more favorable private financing in order to uphold the categorical screen.

views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Mississippi v. EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013) ("We repeat: it is not our job to referee battles among experts; ours is only to evaluate the rationality of EPA's decision[.]"); *Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 82 (D.D.C. 2007) (agency's "reasoning is disputed, but the dispute presents a battle of experts — a battle conducted in an arena that is off limits to APA judicial review").  This is not to say that the Court has dismissed, or ought to dismiss, outright Plaintiffs' own expertise and counterfactual arguments; the Court, however, must give the appropriate deference to the Bank's experience and judgment, especially when each side's experts might reach different conclusions.  Doing otherwise would entangle the Court in the forbidden expert battle and not give the agency the deference that Congress has afforded to it by law.

*     *     *

In sum, the Court finds that the Bank's adoption and continued use of the exportable goods screen in the 2007 EIPs and beyond constituted rational agency decisionmaking. Specifically, the Bank used its experience and expertise to make a reasonable predictive judgment that balanced the Bank Act's two competing directives — to consider the likelihood of substantial economic impact on domestic industry and to process financing transactions in an efficient and competitive manner that funnels critical export opportunities to the U.S.  Indeed, the screen enabled the Bank to resolve financing applications with the promptness that commercial airlines demand, while also allowing the Bank to focus its limited resources on conducting in-depth economic analysis only on those transactions that it reasonably deemed to be the most likely to cause a serious adverse effect, as the Bank Act permits.  As such, the

55

exportable goods screen represented an appropriate, reasonable, and efficient response to the

realities of the domestic and international markets for aircraft financing.  Though Plaintiffs and

their experts may disagree with the Bank's analysis and interpretive decisions, deference is owed

to the Bank's creation of internal procedures that fill in the many gaps left by Congress in the

Bank Act.

Having reached this conclusion, the Court also must conclude that Defendants have

successfully defended the Bank's authorization of the Air India commitments (both preliminary

and final) in the face of Plaintiffs' lawsuit.  Specifically, the D.C. Circuit in *Delta I* gave

Defendants three alternative paths to compliance on remand:

> (i) attempt to provide a reasonable explanation for how the [2007 EIPs] … square
> with the [Bank Act], *or* (ii) adequately consider and explain any adverse effects
> that these particular Air India loan guarantees have on U.S. industries and U.S.
> jobs, *or* (iii) take whatever other action the Bank deems appropriate to comply
> with the Bank Act and the APA.

*Delta I*, 718 F.3d at 978 (emphasis added).  Because these are alternative options, Defendants

must only satisfy one of them to succeed here.  Defendants meet that burden through Response

One, and as such, the Court grants summary judgment in favor of Defendants as to Plaintiffs'

Counts I, II, and III, which allege that the Bank's approval of the Air India commitments

violated the APA, the Bank Act, and the Reauthorization Act.

### C.  Response Two: Plaintiffs' Challenge To The Bank's Alternative Analysis

As an alternative to justifying the exportable goods screen, the D.C. Circuit in *Delta I*

gave the Bank a second option on remand: "adequately consider and explain any adverse effects

that these particular Air India loan guarantees have on U.S. industries and U.S. jobs[.]"  *Id*.  The

Bank attempted to do just that through Response Two.  Plaintiffs now argue through their motion

for summary judgment that the Bank's analysis and conclusions in Response Two are arbitrary

and capricious.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 40.  In particular,

Plaintiffs criticize the Bank for, among other things, its decision to consider only direct competition and not all indirect competition, its analysis of the "price advantage" that Air India might receive from the Bank's financing, and its finding that there is no chronic oversupply problem in the global airline industry. *See id*. at 41-52. The Court addresses these issues and others next.

### 1.  Summary Of Response Two

The Court begins with a summary of the Bank's analysis and conclusions in Response Two. Of relevance here, the Bank first determined "that there will be no direct competition to U.S. airlines from the aircraft financed in connection with [the 2011 Air India commitments]" because

> Air India represented to the Bank that it does not intend to use any of the Ex-Im Bank-financed aircraft to fly routes to the U.S.  Consistent with that representation, of the ten aircraft delivered to Air India [at the time Response Two was published], none has been placed on routes flying to the U.S.

AR at 399, 403.  In addition, the Bank found that Air India is unlikely to deploy the Bank-financed Boeing 787s on India-U.S. routes in the future because Boeing 787s would not be the optimal aircraft for such routes:

> While the 787 is certainly capable of making the trip, it is not the largest aircraft in Air India's fleet that can make the trip.  Generally, on a trip of that length an airline would want a larger aircraft, provided, of course, that the demand is sufficient for a larger aircraft.  Since the demand for travel between the United States and India is very strong, it is expected that Air India would use other, larger aircraft for its routes between these two countries.

*Id*. at 406.  Without actual or likely direct competition between Air India's Bank-financed aircraft and U.S. airlines on the same routes, the Bank determined that "there will not be an 'adverse effect' on U.S. airlines within the meaning of the Bank's Charter." *Id*. at 405.

The Bank then conducted supplemental analysis to assess the possible magnitude of any adverse effects if, hypothetically, the Air India transactions were to lead to direct competition

with U.S. airlines.  *See id*. at 411-19.  To do so, the Bank first calculated that the most significant

financing "price advantage" that Air India could obtain from the Bank, as determined by

comparing the Bank's financing to what a comparable U.S. airline could obtain in the private

market, is \$482,000 per year.[30]  *See id*. at 412-16.  The Bank next explained that this price

advantage is minimal when considered in the context of the cost to purchase a Boeing 787, at an

appraised value of \$116 million, and to operate the aircraft, which runs between \$40 to \$70

million a year, or \$1 billion to \$1.75 billion over the aircraft's 25-year expected life.  *See id*. at

411, 415-16, 421.

Thus, in the Bank's experience with aircraft financing transactions and based on general

financial commonsense, the Bank concluded that a savings of \$482,000 per year is unlikely to

influence an airline's decision to make an investment of such magnitude in new aircraft.  *See id*.

at 416, 417 & n.20.  At the same time, the Bank concluded that this hypothetical \$482,000 in

savings was unlikely to cause passenger displacement for the hypothetical competing U.S. airline

because, using conservative estimates, the \$482,000 translates to an \$8.33 price advantage per

seat, which, the Bank anticipated, is unlikely to affect a passenger's purchasing decision given

that the relevant economy-class ticket between the U.S. and India costs \$1,000 to \$2,000.  *See id*.

at 416.

Finally, the Bank determined that the modest hypothetical harm from the Air India

commitments is far outweighed by the benefit to the U.S. economy from such transactions.  *See*

*id*. at 416-19.  Thus, for the hypothetical new Air India flights that compete directly with a U.S.

---

[30]     This figure would be even lower today under the 2011 ASU because the new ASU was designed specifically to ensure that the overall financing cost of a transaction supported by an ECA (whether the Ex-Im Bank or a European ECA) would be equivalent to the overall financing cost of a transaction supported by private market financing, thus making the new ASU less advantageous to foreign airlines than the 2007 ASU.  *See* AR at 401, 414.

airline, the Bank determined that the U.S. airline's revenue loss from passenger displacement

would be between $32.4 million and $129.5 million. *See id.* at 419. When compared to the

approximate export value of $232 million for two 787s — which, in the Bank's experience, is the

minimum number of aircraft required to provide daily service on such routes — the net benefit to

the U.S. economy would be between $102.5 million and $199.6 million. *See id.* Further, the

Bank concluded that even assuming more aircraft are used in direct competition with the

hypothetical U.S. airline, "the net benefits would still significantly outweigh any adverse effects

for the simple reason that the value of the U.S. aircraft being used on such routes would still

exceed the adverse displacement costs of such routes on U.S. airlines."[31] *Id.*

### 2. Direct Versus Indirect Competition

Plaintiffs criticize the Bank's decision in Response Two to focus on direct competition —

which is defined as "competition from the specific aircraft being exported and which is flown on

a route also flown by a U.S. airline," AR at 406 — as the only possible cause for adverse effects

under the Bank Act, rather than focusing on both direct and indirect competition.[32] *See* Pls.'

Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 44-46. Plaintiffs argue that the Bank's approach

constitutes an artificially narrow definition that is inconsistent with the Bank's duty to "take into

account any serious adverse effect" from its loan guarantees, 12 U.S.C. § 635(b)(1)(B)(ii), and

---

[31]    In addition, the Bank used Response Two to calculate the number of domestic jobs that the Air India transactions would help support. Using the methodology of the Trade Promotion Coordinating Committee, an interagency committee established under the Export Enhancement Act of 1992, Pub. L. 102-429, § 201, 106 Stat. 2186 (1992), and employment data provided by the Bureau of Labor Statistics, the Bank determined that the Air India commitments would support 10,700 jobs in the United States. *See* AR at 404-05.

[32]    The Bank's approach here is consistent with its approach under the 2013 EIPs and Guidelines, which also focus on direct competition, not indirect competition. *See* AR at 454.

that violates the APA by failing to consider an "important aspect of the problem" before the agency. *State Farm*, 463 U.S. at 43.

As the Court has emphasized throughout this decision, the Bank Act provides little guidance (and thus significant discretion) to the Bank regarding *how* it should "take into account any serious adverse effect" of its loans and loan guarantees. 12 U.S.C. § 635(b)(1)(B)(ii). This discretion includes the need to balance competing statutory mandates and to determine a reasonable, practical approach for carrying out the Bank Act's modest requirements. Here, the Bank has considered and rejected Plaintiffs' preferred approach of calculating and considering all real and potential indirect competition for several reasons, including that "an analysis of indirect competition is too speculative to provide a meaningful determination of adverse impact." AR at 406. On consideration of the Bank's explanation, the Court is satisfied that the agency's interpretation is consistent with the Bank Act.

Specifically, Plaintiffs demand that, in addition to direct competition with U.S. airlines, the Bank also should examine "competition between … foreign airlines and U.S. airlines on routes to destinations that the U.S. airlines serve on a connecting basis, either with their own aircraft or those of their alliance partners." Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 45 (citing AR at 734-35). Delta, however, has 19 foreign alliance partners, United Airlines has 25 partners, and American Airlines has 13 partners, many of which have received Bank financing in the past.[33] *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 14-1, at 42 & n.27

---

[33]     Plaintiffs' own examples in *Delta III* also seem to demonstrate the impossibility of their approach, which would require the Bank to examine hundreds of hubs to determine which flights compete through such connections. *See* Pls.' Mem. Supp. Mot. Summ. J., *Delta III*, No. 13-cv-0424-RC, ECF No. 31-1, at 46 n.34 (Emirates: connecting-flight competition via Dubai between U.S. cities and 42 international destinations; LOT: via Warsaw, 49 destinations; Etihad: via Abu Dhabi, 31 destinations; KAL: via Seoul, 52 destinations; and LATAM: via multiple hubs, 17 destinations (citations to AR omitted)).

(citations omitted).  Immediately, then, Plaintiffs' preferred approach appears remarkably burdensome given the countless data points that it would require the Bank to collect before approving a single loan guarantee.  In addition, Plaintiffs want the Bank to examine "competition on routes that [foreign] airlines serve on a connecting basis provided the Bank-supported aircraft are used on routes that do not pass through the United States."  Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 45.  The Bank has explained, however, that this "kind of analysis … is untenable" because

> [t]o consider the adverse impact of indirect competition under these scenarios, Ex-Im Bank would be required to analyze the competitive effects of its support on all possible connections on all U.S. airlines between the U.S. and all foreign destinations which could logically be used as a way station to the ultimate destination.

AR at 410.  Such an approach therefore "would require the Bank to analyze hundreds of routes," *id.*, which "would be an impossible burden to undertake on a single transaction."  *Id.* at 407.

At the same time, the Bank has explained why Plaintiffs' proposed approach to measuring competition is unreliable and speculative to the point of uselessness: "For each person that travels, there are myriad factors that go into the decision of which flight to take.  It would be highly speculative to derive any conclusion about hundreds of such decisions on each of hundreds of different routes."  *Id.* at 410.  Thus, "[e]ven if the Bank were able to collect all of the hundreds of thousands of data points necessary for analyzing indirect competition," as Plaintiffs demand, "deriving reasonable conclusions about indirect competition would be impossible, because the connection of the Bank's loan guarantee to the" speculative indirect effects "is simply too attenuated."  *Id.* at 407.  For these reasons, the Bank has concluded that "the only reasonable approach to analyzing adverse effect[s] in the airline context is to compare direct competition on a 'route to route' basis."  *Id.* at 408.

Plaintiffs claim that the Bank "exaggerate[s]" the problems in making these calculations because the Bank "would only need to analyze destinations as to which a foreign airline's service is reasonably competitive with a U.S. airline's service."  Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 46.  In comments submitted to the Bank, Plaintiffs define a foreign carrier's routes as being "reasonably competitive" with those offered by U.S. carriers when the foreign carrier serves the same ultimate destination "with a circuity less than 1.5 times the shortest distance of the U.S. carriers and their [joint-venture] partners."  AR at 759.  Plaintiffs, however, offer no justification for why their proposed definition is correct, why it is required under the Bank Act, or why it does not just amount to more speculation.  Relatedly, Plaintiffs argue that they "have repeatedly provided the Bank with examples of how to carry out" their alternative indirect competition analysis, *see* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 46 (citing AR at 758-60), but the record reveals that Plaintiffs have identified only the "city-pairs" between which a foreign carrier's and a U.S. carrier's routes are "reasonably competitive" but have not undertaken the substantially more complex follow-up task of considering the actual and potential indirect effects of the Bank's support on all of those routes.

Thus, the Court is not convinced that there is relevant evidence "'in the record'" to which the Bank has "'shut its eyes.'"  *See id.* at 46-47 (quoting *West Ohio Gas Co. v. Public Utils. Comm'n*, 294 U.S. 79, 81-82 (1935)).  Instead, the Bank's refusal to adopt the approach that Plaintiffs prefer, and which no doubt would be more favorable to Plaintiffs' interests, does not, by itself, make the Bank's actions arbitrary and capricious.  *See Theodore Roosevelt Conservation*, 661 F.3d at 73 (judicial review of an agency's selection of alternatives requires "considerable deference to the agency's expertise and policy-making role," and courts must avoid an "unreasonably narrow definition of objectives that compels the selection of a particular

alternative" (internal citations and quotation marks omitted)).  Rather, the Court finds that the

Bank's decision to select a methodology based on administrative feasibility is reasonable and

entitled to substantial deference.  *See West Virginia*, 362 F.3d at 868 (courts "defer to the

agency's decision on how to balance the cost and complexity of a more elaborate model against

the oversimplification of a simpler model" (citation and quotation marks omitted)); *WorldCom*,

238 F.3d at 459 (the agency's "decision to make ease of administration and enforceability a

consideration" was not arbitrary and capricious); *Pub. Serv. Co. of New Mexico v. FERC*, 653

F.2d 681, 690 (D.C. Cir. 1981) ("Administrative feasibility is a factor that may be considered in

determining whether agency action is arbitrary, capricious, or an abuse of discretion.").

Importantly, the Bank's decision to adopt a practical and time-sensitive approach also is

consistent with the Bank Act — which requires the Bank to align its decision-making process

within the timeframes of a commercial transaction while carrying out its mission to support U.S.

exports, *see, e.g.*, 12 U.S.C. § 635(b)(1)(B); S. Rep. No. 99-274, at 8 (1986) (recognizing "the

need for [the Bank] to respond to exporters' requests for support in a timely … fashion") —

while Plaintiffs' alternative methodology, on the other hand, would make it "practically

impossible" for the Bank "to assess all … ripple effects" of a proposed transaction in a timely

and efficient fashion.[34]  *See* AR at 407 n.12.  The Bank therefore has "balance[d] … potentially

---

[34]      In Response Two, the Bank explains the significance of the Bank Act's timing
mandate and why the Bank must be treated differently than a typical regulatory agency:

> The critique that the Bank should not confine itself to direct effects ignores the
> fundamental difference between the Bank's mission and that of regulatory
> entities.  Regulatory agencies may be required to analyze both direct and indirect
> impacts of regulatory requirements, including using cost-benefit analysis that
> contemplates wide-reaching assessments of both direct and secondary benefits
> and building extensive economic models….  However, the Bank must align its
> decision-making process within the prompt timeframes of a commercial

conflicting [statutory] objectives," such that "judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular." *Fresno Mobile Radio*, 165 F.3d at 971.  Defendants have met that standard here.

Contrary to Plaintiffs' claim, moreover, the Bank did not dismiss Plaintiffs' proposed alternative analysis solely because it is too "difficult," Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 47 (citing *Comcast Corp. v. FCC*, 579 F.3d 1, 5 (D.C. Cir. 2009)); instead, the Bank has demonstrated that considering indirect competition would fail to effectuate the Bank Act's mandates because it would require speculation, produce unreliable results, command undue resources, and simply take too long to complete on a transaction-by-transaction basis.  *See* AR at 406-11; *id*. at 408 n.13 ("[I]n the airline context, adverse impact arising from indirect competition is simply speculative, and therefore the Bank looks to the effects of direct competition as the only feasible way of measuring any adverse impact that may arise.").  Accordingly, the Bank's methodology is both consistent with the Bank Act and necessary in order for the Bank to operate in a practical and efficient manner by engaging in meaningful and realistic analysis, as the statute requires.  The Court therefore finds no basis for disturbing the Bank's judgment.  Indeed, this is precisely the type of "highly complex and technical matter[]," *West Virginia*, 362 F.3d at 867 (citation and quotation marks omitted), on which "an agency must have discretion to rely on the reasonable opinions of its own qualified experts," *Marsh*, 490

---

transaction and the practical constraints for assessing the economic impact of its transactions, while carrying out its mission to support U.S. exports.

AR at 407 n.12.

U.S. at 378, and the Court rejects Plaintiffs' invitation to second-guess the Bank's judgment in favor of their own preferred analysis.

3. Plaintiffs' Objections To The Bank's Reliance On Representations Made By Air India

Plaintiffs assert two other objections that the Court must address.  First, in Response Two, the Bank explains that the Air India commitments are unlikely to cause serious adverse economic impact on U.S. airlines because Air India does not use, and did not intend to use, the Bank-financed aircraft on India-U.S. routes to compete directly with U.S. airlines.  *See* AR at 405-06.  Plaintiffs, however, argue that the Bank's reliance on Air India's assertion that it will not use the Bank-financed aircraft in direct competition is "inconsistent with the record" because the Bank's staff allegedly had informed the Board in 2006 that Air India "planned to use Bank-financed planes to access new markets in general and routes between India and the United States in particular."  Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 39-40.

As Defendants point out, however, although the Board memorandum Plaintiffs cite does refer to Air India's general business plans to expand to North America, including the United States, the memorandum says nothing about Air India's planned usage of the specific aircraft financed by the Bank through the 2011 commitments at issue here, which is where the Bank's consideration in Response Two must focus because the Bank Act calls for a transaction-by-transaction analysis and the Bank cannot speculate about all future potential uses of aircraft if the agency is to make timely financing decisions.  *See* AR at 51, 171, 283; Defs.' Reply Supp. Mot. Summ. J., ECF No. 23, at 23-24; *see also* 12 U.S.C. § 635(b)(1)(B)(ii) ("in authorizing any loan or guarantee, the Board of Directors shall take into account any serious adverse effect of *such loan or guarantee*" (emphasis added)); *id*. § 635a-2 (requiring the Bank to consider "the extent to

which *any loan or financial guarantee* is likely to have an adverse effect on industries" (emphasis added)).

Second and relatedly, Plaintiffs argue that the Bank's reliance on a foreign airline's representations about its planned usage of a Bank-financed aircraft creates a "loophole" because an airline can "quickly shift" the routes on which it uses the aircraft. *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 47 n.26. The Bank, however, is reasonable to limit its analysis to the data to which it has access, including a foreign airline's representations about its intended use of Bank-financed aircraft, rather than speculating about what an airline perhaps might do at some unknown future time. *See* AR at 409. Otherwise, the Bank could never perform any competition analysis, as the underlying variables always would be in some degree of flux. *See WorldCom*, 238 F.3d at 459 (the agency's "decision to make ease of administration and enforceability a consideration" was not arbitrary and capricious); *Pub. Serv. Co. of New Mexico*, 653 F.2d at 690 ("Administrative feasibility is a factor that may be considered in determining whether agency action is arbitrary, capricious, or an abuse of discretion.").

Further, the Bank has no reason to assume that foreign airlines are lying in their financing applications about the intended uses for their Bank-financed aircraft, and Plaintiffs have not justified why the Bank's reliance on such affirmations is unreasonable. Indeed, the Bank's reliance on Air India's assertions appears particularly reasonable here, as not only did Air India not use any of the relevant Bank-financed Boeing 787s on routes to the U.S. after their deliveries, but the Bank also determined that a 787 would not be the optimal aircraft for Air India to use on India-U.S. routes anyways due to the airplane's size and capacity. *See* AR at 403, 406.

4.  Through Response Two, The Bank Has Satisfied The *Delta I* Remand Order At This Point

The Court pauses here to point out that the Bank, through Response Two, has satisfied the *Delta I* remand order based on the Court's conclusions thus far.  Specifically, the Court finds that the Bank reasonably interpreted the Bank Act as permitting the agency to consider only direct competition when determining whether adverse effects are likely to occur.  In addition, the Bank explained that the relevant Air India commitments did not, and were unlikely to in the future, result in such direct competition with U.S. airlines.  Accordingly, the Bank reasonably determined that the Air India commitments were highly unlikely to cause "adverse effects" within the meaning of the Bank Act, and the Court therefore concludes that Response Two complies with the D.C. Circuit's remand instructions.  *See Delta I*, 718 F.3d at 978 (ordering Defendants to "adequately consider and explain any adverse effects that these particular Air India loan guarantees have on U.S. industries and U.S. jobs"); *see also* AR at 411 ("[B]ecause the Air India Transactions will not result in any direct competition with U.S. airlines, the Air India Transactions therefore will have *no* significant adverse effect on U.S. airlines.  This determination satisfies the remand from the Court of Appeals, and the analysis could end here." (emphasis in original)).  Thus, the Bank's remaining analysis in Response Two relies on a hypothetical scenario in which it assumes that direct competition does exist, which, of course, the Bank already ruled out.  But even if the Court were to find an error in the Bank's alternative analysis, which it does not, Response Two still is sufficient to meet the agency's burden on remand.

5.  Industry Oversupply Analysis

Turning to the rest of Response Two, Plaintiffs next argue that the Bank's financing hurts U.S. airlines and their employees by contributing to an ongoing, systematic problem of

oversupply in the airline industry.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 41-42.

Plaintiffs therefore allege that Response Two necessarily relies on the Bank's "fatally flawed"

"conclusion that there is no oversupply problem in the global airline industry."  *See id.*

Oversupply, however, plays a critical role at Stage I of the 2013 EIPs and Guidelines, *see* AR at

453 (discussing long-run structural oversupply), while the Air India transactions were approved

under the 2007 EIPs, within which oversupply in the airline industry is not a relevant factor.[35]

*See id*. at 411-19.  Further, Response Two considered the impact of the Air India transactions

without any reliance on or reference to oversupply or undersupply in the airline industry, and

Plaintiffs fail to show how the oversupply issue was relevant to the Bank's analysis there.  *Cf.*

Defs.' Mem. Supp. Mot. Summ. J., ECF No. 14-1, at 45 ("The issue of structural oversupply …

is not directly relevant to the validity of the Bank's analyses in Response Two.").  Thus, the

question of whether structural oversupply exists was immaterial to the reasonableness of the

Bank's analysis in Response Two, and as such, the Court finds no basis to consider here

Plaintiffs' arguments criticizing the Bank's expert oversupply study when such issues played no

role in the 2007 EIPs or Response Two.[36]

---

[35]       At Stage I of the 2013 EIPs and Guidelines, the Bank considers, in reliance on its outside expert's study, "whether a long-run structural oversupply exists in the [global airline] industry," and if such oversupply is deemed to exist, the Bank then proceeds to conduct a country/airline/case-specific analysis to determine whether the circumstances justify Ex-Im Bank support of a proposed aircraft transaction.  *See* AR at 453.  In other words, the purpose of the oversupply analysis at Stage I is to determine whether global supply and demand conditions are such that the Bank should further examine the potential economic impact of its future credit support.  Response Two, on the other hand, dealt only with credit support that already was issued to Air India, and whether oversupply existed did not alter the Bank's analysis there, as the Bank instead relied on the supply and demand conditions of the India-U.S. routes specifically, not the conditions of the global airline industry generally.  *See, e.g.*, *id*. at 417.

[36]       As further evidence, Plaintiffs spend significant time in *Delta III* contesting the Bank's expert oversupply analysis within the context of the 2013 EIPs and Guidelines, *see, e.g.*, Pls.' Mem. Supp. Mot. Summ. J., *Delta III*, 13-cv-0424-RC, ECF No. 31-1, at 33-34, 36-42, but Plaintiffs there raise no oversupply issues in their arguments against the 2007 EIPs.

6.   Price Advantage And The Proper Financing Comparison

Plaintiffs also assert that in determining whether Air India received a "price advantage," the Bank improperly compared Air India, an airline that has experienced several years of financial difficulties, with Southwest Airlines, which was the only investment grade U.S. airline. *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 51.  In Response Two, however, the Bank explains that Air India was effectively deemed "investment grade" for purposes of the relevant financing commitments because the government of India agreed to serve as a guarantor for the Bank, and as such, if Air India defaults, the Bank can collect from the Indian government directly.  *See* AR at 411; *see also id*. at 431 nn.4-5.  Thus, under the Bank's methodology, the sovereign guarantee of the Indian government carries the equivalent of an investment grade credit rating, thereby accounting for the Bank's comparison between Air India and Southwest Airlines.  *See id*. at 411.  Plaintiffs fail to provide any non-conclusory argument discrediting the reasonableness of the Bank's approach to this issue.

Relatedly, Plaintiffs suggest that if Air India were in fact deemed to be an investment grade airline, then private investors would have been willing to fund its aircraft purchases, but internal Bank documents allegedly indicated that Air India could find no such private financing. *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 50-51.  Plaintiffs' argument, however, relies on the misguided significance they give to the availability of private financing, which, in turn, ties into another unpersuasive complaint from Plaintiffs.  Specifically, Plaintiffs argue that Response Two fails because the Bank wrongly determined the cost differential by considering whether "Ex-Im Bank support of the Air India Transactions would provide any financing cost advantage as compared to financing available to a U.S. airline."  *See id.* at 50 (citing AR at 412). Instead, according to Plaintiffs, the proper financing comparison is between the cost of the

Bank's financing to Air India and the cost of the financing that Air India (and not the U.S. airline) "would have received in the private market, assuming it could have found any such financing at all." *Id*. at 51 (suggesting that Air India could not have obtained private market financing for its aircraft purchases). Plaintiffs, however, fail to explain why this comparison is the only correct one under the Bank Act, nor do they show why the Bank's approach is unreasonable.

In particular, Plaintiffs' argument here echoes their similar complaint in regard to the Bank's comparison in Response One. *See* Part IV.B.3.d., *supra*. There, the Court upheld the Bank's comparison as reasonable under the Bank Act for multiple reasons, and the Court does so again here. In short, Plaintiffs' novel methodology overlooks the fact that once an airline decides to purchase a new airplane, the airline has a binary choice between purchasing a U.S.-manufactured Boeing airplane or purchasing a foreign-manufactured Airbus airplane. *See* AR at 420-21. Plaintiffs' favored approach, however, assumes that if the Bank does not provide financing support, U.S. airlines necessarily would be better off because those aircraft will not be purchased otherwise. The administrative record simply does not support that assumption. Instead, in the absence of Bank financing, the foreign airline still would compete with U.S. airlines by purchasing Airbus aircraft with financing support likely provided by a European ECA; this is why the Bank looks to the ECA financing available to the foreign airline to ensure that the Bank's financing is competitive with financing from the foreign ECAs and that those export opportunities are funneled to the U.S. economy. *Cf*. Pls.' Mem. Supp. Mot. Summ. J., ECF No. 12-1, at 52 (resting analysis on contention that "Air India could not have secured *any* private financing for its purchases" and ignoring the reality that the Bank also must compete with foreign ECAs to funnel aircraft purchases away from Airbus and to the U.S.).

Additionally, in the summary of Response Two above, the Court noted that the Bank conducted a hypothetical analysis that assumed Air India's Bank-financed Boeing 787 aircraft would compete directly with a U.S. airline on an India-U.S. route, and even with this assumption, the Bank still concluded that the adverse economic effects on the U.S. airline would be negligible because the hypothetical cost savings from the Bank's financing translated to just an $8.33 price advantage per seat, which is immaterial given that an economy-class ticket between the U.S. and India costs upwards of $1,000 to $2,000.  *See* Part IV.C.1., *supra*.  Relying on similar calculations and using the largest possible savings in interest of $12 million over the life of the 12-year loan as calculated in Response Two, Plaintiffs now argue that if Air India buys 30 aircraft, it could save $360 million (*i.e.*, $12 million in interest savings multiplied by 30), which is enough to buy three additional Boeing 787 aircraft.  *See* Pls.' Reply Supp. Mot. Summ. J., ECF No. 21, at 47.  Plaintiffs allege that these calculations disturb the Bank's finding that the cost differential is immaterial.  *See id.*

Economically speaking, Plaintiffs' hypothetical is unconvincing because it seems to treat the total $12 million in interest savings over the life of the loan as an upfront cash payment that Air India could accumulate and immediately use to buy new aircraft, which clearly is not accurate or realistic.  Yet even treating the interest savings this way, Plaintiffs' suggestion that any financially sensible airline would commit to purchase aircraft that are worth $360 million, and that therefore would cost between $3 billion and $5.25 billion to operate over the lifespan of the aircraft, in order to save $12 million over 12 years in another transaction is unpersuasive and contrary to the record in this case.  Instead, it is far more reasonable that, first, airlines do not make purchasing decisions based on such minimal financing cost savings, and second, when airlines do purchase new aircraft, they do so only to meet a specific need existing at that time,

not to obtain minimal savings on another, otherwise unnecessary transaction elsewhere.  *See* Defs.' Reply Supp. Mot. Summ. J., ECF No. 23, at 26-27.  The Court therefore again finds no basis for disturbing the Bank's judgment.

*       *       *

To summarize, the Court is satisfied that the Bank did not act arbitrarily and capriciously when it analyzed the Air India commitments in Response Two.  Instead, Response Two constitutes the Bank's well-considered and reasonable attempt to demonstrate that the Air India transactions were not likely to cause serious adverse effects on U.S industry and employment, thereby again satisfying Defendants' obligation on remand from *Delta I* and, at the same time, demonstrating that the Bank's approval of the Air India commitments was reasonable and proper.  Though Plaintiffs surely disagree with the Bank's analysis in Response Two and the Bank's procedures in general, they again fail to demonstrate how the Bank's actions were unreasonable or inconsistent with the modest requirements of the Bank Act, particularly given the deference owed to the agency.  Accordingly, the Court concludes that, through both Response One and Response Two, Defendants have satisfied the *Delta I* remand order.

## V.  CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 30, 2015                                   RUDOLPH CONTRERAS
                                                         United States District Judge